UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAMROCK POWER SALES, LLC,

           Plaintiff/Counterclaim
           Defendant,

    v.

JOHN SCHERER, PATRICE TILEARCIO,
SCHERER UTILITY SALES, LLC, and
STORM KING POWER SALES, LLC,

           Defendants.

JOHN SCHERER,

           Counterclaim
           Plaintiff,

    v.

SHAMROCK POWER SALES, LLC,

           Counterclaim
           Defendant.

No. 12-CV-8959 (KMK)

OPINION & ORDER

Appearances:

Kelly Burns Gallagher, Esq.
Pamela Jane Moore, Esq.
McCarter & English, LLP
Hartford, CT
*Counsel for Plaintiff/Counterclaim Defendant Shamrock
Power Sales, LLC*

Kenneth S. Rones, Esq.
The Law Firm of William G. Sayegh, P.C.
Carmel, NY
*Counsel for Defendant/Counterclaim Plaintiff John
Scherer and Defendants Patrice Tilearcio, Scherer
Utility Sales, LLC, and Storm King Power Sales, LLC*

KENNETH M. KARAS, District Judge:

Shamrock Power Sales, LLC ("Plaintiff" or "Shamrock") brings this Action against Defendants John Scherer ("Scherer"), Patrice Tilearcio ("Tilearcio"), Scherer Utility Sales, LLC, ("Scherer Utility") and Storm King Power Sales, LLC ("Storm King") (collectively "Defendants"), alleging fourteen causes of action arising out of Scherer's employment with Shamrock and Scherer's founding of his own companies, Scherer Utility Sales and Storm King Power Sales, for which he and his wife, Tilearcio, have worked.  Before the Court is Plaintiff's Motion for Partial Summary Judgment.  (Dkt. No. 69.)  Specifically, Plaintiff moves for summary judgment on five of its claims: Count III (breach of fiduciary duty), Count V (misappropriation of trade secrets), Count X (fraud in the inducement), Count XI (faithless servant), and Count XIV (unjust enrichment).  Related to its Summary Judgment Motion, Plaintiff also moves to strike many documents submitted by Defendants in opposition to the Motion for Partial Summary Judgment.  (Dkt. No. 82.)  For the following reasons, Plaintiff's Motion to Strike is granted in part, and Plaintiff's Motion for Partial Summary Judgment is granted.

## I.  Background

### A.  Factual Background

This case arises out of the breakdown in the employment relationship between Scherer and Shamrock, Scherer's formation of his own companies that competed with Shamrock, Scherer's receipt of an advance of a bonus, which he deposited the day before quitting, and Scherer's use of certain information in connection with his new companies.  The key issues in contention are whether Scherer began competing against Shamrock while still employed by the latter, whether Shamrock's policy requires the return of the advance of the bonus, and whether

the information Scherer is using in his new companies is proprietary information belonging to Shamrock.

### 1.  Parties

Shamrock is a company "that sells high voltage power equipment and serves as the exclusive representative for manufacturers of high voltage products."  (Decl. of Elizabeth Mott Smith in Supp. of Mot. for Partial Summ. J. ("Smith Decl.") App. (Statement of Undisputed Material Facts in Supp. of Pl. Shamrock Power Sales, LLC's Partial Mot. for Summ. J. ("Pl.'s 56.1")) ¶ 1 (Dkt. No. 71); Statement of Disputed Material Facts in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Defs.' 56.1") ¶ 1 (Dkt. No. 78); *see also* Tr. of Prelim. Injun. Hr'g ("PI Tr.") 36.)  Andrew McMahon ("McMahon") is Shamrock's president.  (Pl.'s 56.1 ¶ 19; Defs.' 56.1 ¶ 19.)  Shamrock has approximately nine employees, including three full-time and one part-time outside sales representatives.  (Pl.'s 56.1 ¶ 2; Defs.' 56.1 ¶ 2; PI Tr. 110–11.)

Scherer and Tilearcio are both residents of Cold Spring, New York, and are married to each other.  (Pl.'s 56.1 ¶¶ 3–4; Defs.' 56.1 ¶¶ 3–4.)  Scherer Utility is a New York Limited Liability Company with a principal place of business in Cold Spring, New York.  (Pl.'s 56.1 ¶ 5; Defs.' 56.1 ¶ 5.)  Both Scherer and Tilearcio are "member[s] and employee[s] of Scherer Utility."  (Pl.'s 56.1 ¶¶ 6–7; Defs.' 56.1 ¶¶ 6–7.)  On or about January 3, 2013, with the knowledge and consent of Tilearcio, Scherer created a new entity, Storm King, and transferred assets from Scherer Utility to Storm King.  (Pl.'s 56.1 ¶ 8; Defs.' 56.1 ¶ 8.)  Scherer is a member and employee of Storm King, and Tilearcio is an employee of Storm King.  (Pl.'s 56.1 ¶¶ 9–10; Defs.' 56.1 ¶¶ 9–10.)

### 2.  Shamrock's Business

Shamrock is the exclusive sale representative for certain manufacturers of high voltage power equipment; these manufacturers are Shamrock's clients.  (Pl.'s 56.1 ¶ 11; Defs.' 56.1 ¶ 11.)  Shamrock sells its clients' products to end users such as utility companies; these end users are Shamrock's customers.  (Pl.'s 56.1 ¶ 12; Defs.' 56.1 ¶ 12.)  Shamrock's customers include Con Edison, Long Island Power Authority, Orange and Rockland Utilities, Central Hudson Gas and Electric, National Grid, Public Service Gas and Electric, New York Power Authority, Long Island Railroad, New Jersey Transit, Metro North Railroad, Wesco, and Graybar.  (Pl.'s 56.1 ¶ 12; Defs.' 56.1 ¶ 12.)  Many of Shamrock's relationships with its clients, the manufacturers, are governed by contracts with confidentiality provisions that permit Shamrock to serve as the clients' exclusive sales representative in certain geographic areas.  (Pl.'s 56.1 ¶ 13; Defs.' 56.1 ¶ 13.)  Shamrock has developed long-term relationships with most of its clients and has served as their exclusive representative in New England and along the east coast for a number of years. (Pl.'s 56.1 ¶ 14; Defs.' 56.1 ¶ 14.)

### 3.  Scherer's Employment with Shamrock

In 2004, Shamrock hired Scherer as an outside sales representative, which meant that his responsibilities would be to sell Shamrock's clients' products to Shamrock's customers and potential customers.  (Pl.'s 56.1 ¶ 21; Defs.' 56.1 ¶ 21.)  Furthermore, Shamrock paid Scherer to meet with its customers, and the hundreds of meetings he had with Shamrock's customers were "in his capacity as a Shamrock Power sales representative;" indeed, part of Scherer's job was to establish relationships with customers and clients on Shamrock's behalf, and Scherer was compensated for doing so.  (*See* Pl.'s 56.1 ¶ 28; PI Tr. 120–21 (Scherer Testimony) ("Q:  And all of your hundreds of meetings with utility companies, these were all in your capacity as a

Shamrock Power Sales representative, correct?  A:  Yes.  Q:  So in fact, Shamrock paid you to meet with utilities, this was your job, correct?  A:  Correct. . . . Q:  Would you agree with the fact that Shamrock Power over the past eight years paid you to establish relationships with customers and clients of Shamrock Power?  A:  I would, yes.").)[1]  Scherer was assigned to the sales territory of the metropolitan New York City and New Jersey region.  (Pl.'s 56.1 ¶ 22; Defs.' 56.1 ¶ 22.)  Shamrock's customers in that region include Con Edison, Central Hudson Gas and Electric, National Grid, Long Island Power Authority, Orange and Rockland Utilities, Public Service Electric & Gas, New York Power Authority, Long Island Railroad, New Jersey Transit, and Metro North Railroad.  (Pl.'s 56.1 ¶ 23; Defs.' 56.1 ¶ 23.)  Scherer had no customer contacts in his assigned sales territory when he started with Shamrock.  (Pl.'s 56.1 ¶ 24; Defs.' 56.1 ¶ 24.)  Because Scherer had no prior sales experience in the industry or the region, Shamrock devoted approximately six months to one year to having Scherer travel with Andrew McMahon, Sr. ("McMahon Sr.") to introduce him to customer and client contacts.  (Pl.'s 56.1 ¶ 25; Am. Answer to Pl.'s Second Am. Compl. and Countercl. ("Answer") ¶ 9 (Dkt. No. 48); PI Tr. 58–59, 126–27.)[2]  McMahon Sr. "essentially showed Scherer the ropes and taught him the territory at

---

[1] The Court disregards Defendants' objection to this fact, which contains no citations to the record and is contradicted by Scherer's above-cited admission.  (See Defs.' 56.1 ¶ 28.)

[2] Defendants dispute this assertion in their Rule 56.1 statement.  Specifically, Defendants assert that

> Scherer was hired by McMahon based on the experience noted in Scherer's résumé, which reflects that Scherer had cold called and met with over 50 managers and engineers at various utilities throughout the Northeast, had been an exhibitor at several utility tradeshows in the Northeast and Florida where he met engineers, operations personnel and managers from various utility companies and Scherer had developed and presented a paper for one of the tradeshows in Florida.

(Defs.' 56.1 ¶ 25 (citations omitted).)  However, Defendants cite only Exhibit G to Scherer's Declaration, which is Scherer's resume.  (See id.; Decl. of John K. Scherer in Opp'n to Pl.'s Mot.

Shamrock Power."  (Pl.'s 56.1 ¶ 26; PI Tr. 126–27.)[3]  In his role as a sales representative,

"Scherer held a position of trust and confidence at Shamrock Power."  (Pl.'s 56.1 ¶ 29; Defs.'

56.1 ¶ 29.)

### 4.  Confidential Information

In order for Scherer to complete his duties, Shamrock provided him information

regarding Shamrock's industry contacts, its client contacts, pricing lists, commission schedules,

actual and potential customer contacts, contracts, and order history.  (Pl.'s 56.1 ¶ 27; Answer ¶ 9

(admitting that McMahon Sr. introduced Scherer to some customers and shared with him some

product information for some manufacturers and the pricing of those products); PI Tr. 60–62,

90–91.)[4]  Plaintiff contends that in Shamrock's industry, for security purposes, the identities,

---

for Partial Summ. J. ("Scherer Decl.") Ex. G (Résumé) (Dkt. No. 76).)  Putting aside any hearsay
issues with this résumé, this evidence does not and cannot be used to dispute Plaintiff's claims
about McMahon's belief that he needed to spend the time he did to train Scherer and introduce
him to Shamrock's clients and customers.

[3] Defendants dispute this, relying on evidence that, as explained below, is inadmissible.
(Defs.' 56.1 ¶ 26.)  Moreover, the evidence does not support their contentions, and Scherer
himself testified to the veracity of the statement in Plaintiff's 56.1 statement.  (*See* PI Tr. 126–27
(Testimony of Scherer) ("Q:  And Andy McMahon Sr. essentially showed you the ropes and
taught you your territory, is that correct?  A:  Yes.").)

[4] Defendants' opposition to this paragraph contains no citations whatsoever, and as such
is disregarded.  (*See* Defs.' 56.1 ¶ 27.)  Moreover, Defendants only assert that there was not a
"confidential customer contact list," which assertion is nonresponsive to paragraph 27 of
Plaintiff's Rule 56.1 statement.
Additionally, as discussed below, Defendants requested permission to file opposition to
Plaintiff's Motion to Strike months after the deadline, which was granted.  (Dkt. No. 92.)
Subsequently, Scherer and Tilearcio submitted declarations containing material opposing
Plaintiff's Motion for Partial Summary Judgment, which they were not permitted to do.  The
Court will nonetheless consider the additional evidence submitted by Defendants.  As is relevant
here, Scherer, in his supplemental declaration, claims, "Mr. McMahon[] also testified at the
Preliminary Injunction Hearing that Plaintiff had educated me, provided me with special and
otherwise unavailable private and proprietary information which I would be unable to utilize
elsewhere or on my own, [which] is also untrue."  (*See* Decl. of John K. Scherer in Opp'n to Pl.'s
Mot. for Partial Summ. J. ("Scherer Supp. Decl.") ¶ 10 (Dkt. No. 93).)  There is no dispute about

location, and contact information for the purchasing engineers at its customers' and potential

customers' sites are not widely known and, therefore, an individual seeking to sell high voltage

power equipment cannot simply make a cold call.  (Pl.'s 56.1 ¶ 15; PI Tr. 54–56.)  In particular,

Plaintiff notes that the identities and locations of Shamrock's engineering contacts at customers

such as Con Edison, Central Hudson Gas & Electric, Orange and Rockland, and others were

confidential trade secrets and not publicly disseminated.  (Pl.'s 56.1 ¶ 67; *see also* PI Tr. 69–70

(noting employees were prohibited from giving out account and customer information).)

Plaintiff also proffers that it has "devoted significant time, effort, and money to establishing

relationships with its Customer Contacts over a number of years, and to maintaining the

confidentiality of the contact information for its Customer Contacts and the purchasing needs

and preferences of its Customers."  (Pl.'s 56.1 ¶ 16; *see also* PI Tr. 40, 48–49, 53–54, 55, 58, 61–

63, 85.)  Shamrock takes "reasonable measures to protect that information from dissemination,"

including keeping the information in a locked building and on a password-protected computer

system, and sharing it with sales representatives only on a need-to-know basis.  (Pl.'s 56.1 ¶ 17;

PI Tr. 109–10.)  Shamrock also has an employee handbook emphasizing the need to keep this

information confidential.  (Pl.'s 56.1 ¶ 18; PI Tr. 67–70; Smith Decl. Ex. J (Handbook), at 1, 4,

---

what information Scherer received, merely whether it was readily available or rather private and
proprietary, and this conclusory assertion cannot create an issue of fact in that respect.  *See, e.g.*,
*Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014) (not crediting "legal conclusions
or conclusory allegations" in Rule 56.1 statements or declarations); *Lachira v. Sutton*, No. 05-
CV-1585, 2007 WL 1346913, at *1 (D. Conn. May 7, 2007) ("[C]onclusory allegations,
examination of thoughts, opinions, argument and legal conclusions are all prohibited from
affidavits submitted in support of, or opposition to, a summary judgment . . . ."); *Larouche v.
Webster*, 175 F.R.D. 452, 455 (S.D.N.Y. 1996) ("When ultimate facts and legal conclusions
appear in an affidavit, such extraneous material should also be disregarded by the court.").

10, 13, 20.)[5]  Moreover, McMahon frequently reminded Shamrock employees of the need to maintain the confidentiality of client and customer information.  (Pl.'s 56.1 ¶ 19; PI Tr. 61.)[6] Plaintiff claims that the information retained by Scherer had independent economic value for Shamrock because it was not publicly available, and without maintaining control of its customer information, manufacturers could contact the customers directly and cut out the need for Plaintiff's business.  (Pl.'s 56.1 ¶ 68; PI Tr. 69–70.)  For that reason, Shamrock employees were told not to give their contacts' information out to anyone, including manufacturers.  (Pl.'s 56.1 ¶ 69; PI Tr. 61.)  Shamrock also does not share its line card information publicly so as not to give competitors information on what business Shamrock has and what to target.  (Pl.'s 56.1 ¶ 70; PI Tr. 43.)[7]  Finally, Plaintiff asserts that Shamrock has a policy, of which Scherer was aware, that required employees to return confidential and proprietary information upon the termination of their employment.  (Pl.'s 56.1 ¶ 20; PI Tr. 73.)[8]

---

[5] Defendants dispute this, stating that no one gave or showed Scherer an employee handbook during his time working at Shamrock.  (Defs.' 56.1 ¶ 18 (citing Scherer Decl.); *see also* Scherer Decl. ¶ 32 ("[D]uring my employment with Plaintiff I was never provided with or ever saw an employee handbook.").)  However, this statement does not refute the existence of the handbook, which is attached as an exhibit to Plaintiff's counsel's declaration.  (*See* Smith Decl. Ex. J (Handbook).)

   Additionally, the Court notes that no citation in Defendants' Rule 56.1 statement to Scherer's Declaration contains a pin cite—that is, Defendants merely generally cite Scherer's Declaration without identifying which paragraph purportedly supports their assertion, leaving Plaintiff and the Court to attempt to discern what paragraph they are referring to.

[6] Defendants dispute this, stating that McMahon did not remind Scherer of the need to maintain confidentiality of client and customer information and that the identity of Shamrock customers is readily ascertainable.  (Defs.' 56.1 ¶ 19.)  In support of these assertions, Defendants cite to Scherer's Declaration and to Exhibit KK to that Declaration.  However, nothing in Scherer's Declaration supports Defendants' assertion, and Exhibit KK is irrelevant.

[7] A line card is a list of companies represented.  (PI Tr. 46.)

[8] Defendants dispute this but do not provide any supporting citations to the record.  (*See* Defs.' 56.1 ¶ 20.)

Defendants forcefully dispute that the contacts are confidential, and also dispute that the line card is confidential, but do not appear to dispute that the other information listed above is confidential.  (*See, e.g.*, Defs.' 56.1 ¶ 27 (responding to an assertion that Shamrock provided Scherer with access to "confidential, proprietary and trade secret information regarding Shamrock Power's industry contacts; its Client contacts, pricing lists, and commission schedules; and its actual and potential Customer Contacts, contracts and order histories" by stating that there did not exist a "confidential customer contact list"); *id.* ¶ 68 (responding to an assertion that the information that had been deleted and retained by Defendants—including client contact information, price lists, account information, and customer communications—was not publicly available by stating that "Scherer disputes that the contacts, whether at a utility[] or at a manufacturer[,] are not publicly available," and that McMahon did not tell him not to give out customer contact information).)

First, Defendants dispute that contacts at Shamrock's customers and clients were confidential and instead argue that they are readily available online and at trade shows.  (*See, e.g.*, Defs.' 56.1 ¶¶ 15–17, 43, 67–71.)  In support of these contentions, Defendants cite the following documents: a page from the Preliminary Injunction transcript, Scherer's Declaration, Exhibits D, E, F, OO, G, and KK, to Scherer's Declaration, and Exhibits C and H to Defendants' Rule 56.1 statement.[9]  The Court will address each piece of evidence in turn.  First, Defendants cite to McMahon's testimony at the Preliminary Injunction hearing, stating that McMahon

_____

[9] Scherer cites to Exhibits C and H to his own Declaration, (*see, e.g.*, Defs.' 56.1 ¶¶ 68, 73, 84), but no such exhibits exist.  Indeed, the labeling of exhibits to both the Scherer Declaration and the Rule 56.1 statement is somewhat of a mystery to the Court.  However, there are Exhibits C and H to Defendants' Rule 56.1 statement and it appears that it is to those documents that Scherer is referring.

testified at the hearing that he had made a cold call the day before his testimony.  (Defs.' 56.1

¶ 15 (citing PI Tr. 103).)  The testimony given was as follows:

> [The Court:]  If you want to ask questions dealing with how many cold calls he's
> done in the past five years, go ahead.  Q:  I guess that would be my question.  When
> is the last time you made a phone call to a utility to ask to speak to a standards
> engineer?  A:  Yesterday.

(PI Tr. 103.)  Although the context might indicate that McMahon cold called a utility, Scherer

did not actually ask him when the last time was that he cold called a utility.  Furthermore, there

is no evidence as to whether that call was successful.  Next, Exhibit C to the Defendants' Rule

56.1 statement contains emails between Scherer and various contacts.  One email string suggests

that Scherer successfully cold called a contact at a manufacturer called Electroline Corp.  (Defs.'

56.1 Ex. C, at unnumbered 11–12.)  However, the rest of the emails in that Exhibit contain no

indication whatsoever as to how Scherer got into contact with the people he was emailing.

Exhibit D to the Scherer Declaration is also a collection of emails that appear to show Scherer

emailing various contacts.  Only some emails in that Exhibit contain any indication of where he

got the contact information.  For example, the emails with Northeast Utility suggest that Scherer

met the contact "a few months ago" and that he "worked at NU for many years prior."  (Decl. of

John K. Scherer in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Scherer Decl.") Ex. D, at

unnumbered 8 (Dkt. No. 76).)  As another example, the emails with a person at National Grid in

fact support a finding that contact information is not widely available, as Scherer emailed an

apparently already known contact to ask for another contact at National Grid.  (*Id.* at

unnumbered 16.)  Similarly, Scherer also emailed an apparently known contact at Northern

Utilities to ask for another contact there.  (*Id.* at unnumbered 23.)

No other email correspondence is relevant to the question of how public the contact

information is.  Exhibit E to the Scherer Declaration is a collection of business cards.  Exhibit F

is an unidentified document or series of documents that contain contact information for some employees of some manufacturers.  Exhibit H to the Defendants' Rule 56.1 statement is a collection of several unrelated documents.[10]  These documents contain contact information for various contacts at various utilities.  Setting aside the evidentiary issues Plaintiff raises with respect to the documents introduced by Defendants, (*see* Notice of Pl. Shamrock Power Sales, LLC's Mot. To Strike Portions of Defs.' Submissions in Opp'n to Mot. for Partial Summ. J. (Dkt. No. 82); Shamrock Power Sales, LLC's Mem. of Law in Supp. of Mot. To Strike Portions of Defs.' Submissions in Opp'n to Mot. for Partial Summ. J. ("Pl.'s Mem. in Supp. of Mot. To Strike") (Dkt. No. 83)), there is a fundamental relevance issue with these exhibits.  There is no evidence as to where Defendants got most of this information, including the business cards and various other documents that do not appear to be website printouts.  Moreover, there is no indication that the contact information provides either accurate contact information or contact information for the relevant people.[11]

Next, Scherer's Declaration states that while he was employed at a consulting firm in Vermont, Dusfresne Henry, from 2001 to 2004, he "made many cold calls at utilities in order to solicit [the company's] consulting services," and that he "was easily able to find the utility contact person and telephone number either through the internet, tradeshow, or an organization and [he] would call, introduce [himself] and ask if [he] could either send them some information on [the company's] services offered or ask to visit them in person."  (Scherer Decl. ¶¶ 6, 11.)

---

[10] The Court cannot even say for sure how many documents there are because the exhibit is so unclear.

[11] In his supplemental declaration, Scherer also asserts that it is common knowledge which utilities operate in different areas and that the location of the utilities are common knowledge.  (*See* Scherer Supp. Decl. ¶¶ 12–13.)  However, this is simply not material to the issue of whether the customer contacts' information is readily available.

Scherer also declared that "[t]he identities of engineers and/or managers at electric utility companies are readily ascertainable at Tradeshows, Linked In, Data.com, Western Publishing website, utility websites, the internet, and networking," as are the identities of manufacturers' contact persons.  (Scherer Decl. ¶¶ 26, 30.)  However, this evidence is not convincing because it does not address whether Shamrock's customers' and clients' contact information is readily available and whether Defendants could readily ascertain the contact information of the appropriate person to call.  Moreover, the Court notes that the only fact Defendants even attempt to dispute is the availability of the contact information; however, Plaintiff asserts that its confidential client information also included information such as its clients' order histories and correspondence between the parties.

Scherer also declared that since leaving Shamrock he has met with and emailed many engineers or engineering managers at many major electric utility companies in upstate New York, Connecticut, Massachusetts, New Hampshire, and Maine as well as other states outside of Plaintiff's territories, and that he has sold his manufacturers' products to utility companies outside of the New York City and New Jersey area.  (*Id.* ¶¶ 27–28.)  This assertion does not address the question of whether Plaintiff's contact information of customers and clients was confidential.  Finally, Scherer declares that he was never given a confidential customer list.  (*Id.* ¶ 29.)  Scherer's fixation on the idea that there did not exist a "confidential customer list" is irrelevant because nowhere does Plaintiff state that such a list existed.  Rather, Plaintiff asserts, and sets forth evidence in support of the finding that, it kept client information confidential.

Additionally, Defendants contest whether Shamrock's line card was confidential, (*see* Defs.' 56.1 ¶ 70), citing to Exhibit KK to the Scherer Declaration as well as to the Declaration itself.  Exhibit KK is apparently a collection of line cards from other companies that do publicize

this information.  (*See* Scherer Decl. Ex. KK.)  However, Defendants provide no evidence that contradicts Plaintiff's evidence that it keeps its own line card confidential.  Moreover, nothing in Scherer's Declaration addresses the confidentiality of line cards.  Thus, the undisputed evidence shows that Shamrock kept its line card confidential.[12]

### 5.  Company-Provided Equipment and Related Policies

Shamrock provided Scherer with a company-owned laptop that contained operating systems and software licensed to Shamrock.  (Pl.'s 56.1 ¶ 33; Defs.' 56.1 ¶ 33.)  Shamrock also provided Scherer with a company-owned cellular smart phone, a company-owned vehicle, a company-issued credit card to use for business-related expenses, and other equipment and supplies related to Scherer's duties.   (Pl.'s 56.1 ¶ 34; Answer ¶ 10 (admitting that Shamrock provided Scherer with a laptop containing an operating system and some software, as well as a smart phone, a company-owned vehicle, a company-issued credit card, and some other equipment and supplies); PI Tr. 119.)[13]  Scherer was advised by Shamrock that these items were

---

[12] Indeed, as Plaintiff points out in reply, Defendants' own documents indicate that they keep their line card confidential.  (*See* Second Decl. of Elizabeth Mott Smith in Supp. of Mot. for Partial Summ. J. Ex. BB (Email from John Scherer to James C. Bach (Oct. 18, 2012)) (Dkt. No. 81) (providing a list of Scherer Utility's manufacturers and requesting the recipient of the email to keep the list "[c]onfidential").)

[13] Defendants' opposition to this is not supported by any citations to the record and is therefore disregarded.  (*See* Defs.' 56.1 ¶ 34.)  However, Plaintiff does not cite anything in the record to support a finding that, as Plaintiff asserts, Shamrock paid for Scherer's internet access.  Indeed, the citations provided by Shamrock support a finding that there is a question of fact about whether Shamrock paid for Scherer's internet access.  (*See* Pl.'s 56.1 ¶ 34 (citing PI Tr. 119–20 (Scherer Testimony) ("Q:  And Shamrock Power provided you with a cell phone, laptop, they paid for all your Internet and telephone expenses related to those, correct?  A:  That would be incorrect with respect to the Internet access.")).)  The dispute over this issue, however, is immaterial.

to be used for company business only, and were not to be used for personal reasons.  (Pl.'s 56.1 ¶ 35; PI Tr. 65–66, 73–76.)[14]

With regard to use of email, it was company policy that all communications with current or potential clients or customers were to be copied to Shamrock's email account, shamrockpwr@msn.com.  (Pl.'s 56.1 ¶¶ 36–37; PI Tr. 121–22 (Scherer Testimony) ("Q:  Now, company policy and company practice was that you would copy the ShamrockPWR account, the main e-mail account, on all your business e-mails, correct?  A:  Correct. . . . Q:  And despite company policy, which you agreed was company policy, you didn't always copy the Shamrock Power e-mail account on e-mails you were sending to customers and clients, correct? A:  Correct."); *see also id.* at 124 (indicating that Scherer did not always CC the Shamrock email account in connection with certain transactions); Answer ¶ 23 (admitting that Scherer withheld several emails from Shamrock).)[15]

### 6.  The Start of Scherer Utility

On September 28, 2011, unbeknownst to Shamrock and while Plaintiff was still employed by Shamrock, Scherer and Tilearcio formed Scherer Utility.  (Pl.'s 56.1 ¶ 41; PI Tr. 115–17; Smith Decl. Ex. D (Articles of Organization).)[16]  Thereafter, Scherer and Tilearcio

---

[14] Defendants' opposition is not supported by any citation and is therefore disregarded. (*See* Defs.' 56.1 ¶ 35.)

[15] Defendants' objections to paragraphs 36 and 37 in Plaintiff's 56.1 are non-responsive. (*See* Defs.' 56.1 ¶¶ 37–37.)  Moreover, the citation in Defendants' paragraph 36 does not support its assertion, and paragraph 37 does not contain any citations.  (*See id.*)

[16] Defendants' opposition to this paragraph is not helpful, as it addresses when Scherer Utility began competing with Shamrock's business.  Defendants assert that Scherer Utility began business on October 8, 2012, citing Scherer's Declaration.  (Defs.' 56.1 ¶ 41.)  On this point, Defendants state that "Scherer disputes that he or any defendant competed with Plaintiff[']s business but admits that Scherer Utility Sales began business on October 8, 2012."  (Defs.' 56.1 ¶ 41.)  This assertion must be read to refer to when Scherer Utility began competing with

opened a business checking account for Scherer Utility, with both Scherer and Tilearcio as account holders.  (Pl.'s 56.1 ¶ 42; Smith Decl. Ex. F (Dep. Tr. of John Scherer ("Scherer Dep.")), at 127–28; Smith Decl. Ex. M (Defs.' Apr. 2013 Discovery Responses) ¶ 33.)[17]

Scherer purports to dispute that he sought business on his own behalf or on Scherer Utility's behalf while still employed at Shamrock, instead arguing that he did not start working on behalf of himself and Scherer Utility until October 8, 2012, the day he resigned from Shamrock.  (*See, e.g.*, Defs.' 56.1 ¶¶ 41, 43.)  However, after reviewing the record, the Court finds that the undisputed evidence shows that Scherer worked on his own behalf in at least two ways that he did not disclose to Shamrock before resigning; indeed, Scherer has admitted as such several times.

First, Scherer represented manufacturer Partner Technologies, Inc. ("PTI") in a transaction that ultimately resulted in $271,806 in sales to Shamrock's customer, Con Edison, on behalf of PTI.  (Pl.'s 56.1 ¶ 44.)  Scherer "disputes that he and/or Scherer Utility Sales formally represented [PTI] before he resigned from Shamrock," pointing to the fact that the contract with PTI is dated October 10, 2012.  (Defs.' 56.1 ¶ 44 (citing Scherer Decl.; Defs.' 56.1 Ex. FF (Sales Representative Agreement)).)[18]  However, the listing of accounts receivable for Scherer, Scherer

---

Shamrock's business, rather than when the Scherer Utility was formed, as such a reading of this statement would render it inconsistent with other admissions Scherer made both in his Declaration and in his prior testimony at the Preliminary Injunction Hearing, wherein he admitted he formed Scherer Utility in September 2011.  (*See* PI Tr. 115–17 (admitting he incorporated Scherer Utility in September 2011); Scherer Decl. ¶ 20 ("Knowing that I would be leaving Shamrock, I formed my own corporation, Scherer Utility Sales on September 28, 2011.").)

[17] Defendants' opposition contains no citations to the record.  (*See* Defs.' 56.1 ¶ 42.)

[18] Defendants incorrectly cite this as Exhibit FF to the Scherer Declaration, an exhibit that does not exist.

Utility, or Storm King, (*see* Smith Decl. Ex. N (Accounts Receivable)), lists three purchase

orders on October 14, 2011 between manufacturer PTI and customer Con Edison, with $271,806

paid to Scherer Utility, (*see id.* at unnumbered 1).  Moreover, Scherer gave the following

deposition testimony on this topic:

> Q:  So I guess to back up, you have orders for Partner Technologies on October 14th of 2011.
>
> A:  Yes.
>
> Q:  So you were still employed by Shamrock at that time?
>
> A:  I was.
>
> \* \* \*
>
> Q:  So were you representing Partner Technologies in October of 2011?
>
> A:  No.
>
> Q:  So how do you – how did it come about that you have purchase orders that are dated October 14th, 2011?
>
> A:  I had told Andy about them, that we'd want to probably sign them on, so I could sell some of their products to Con Edison, but I'm not sure if Andy signed the agreements.  I don't think he did, but I know he was interested, and but I was just sort of working for them without a contract.
>
> Q:  Were you working for them as a sales representative?
>
> A:  As a sales agent and stuff, but I wasn't working for them.
>
> Q:  What do you mean, sales agent and stuff?
>
> A:  It's my—that's my title, sales agent, but I wasn't working for them.  I didn't have a contract for them.
>
> Q:  So you were working as a sales agent on behalf of yourself, John Scherer, with them?
>
> A:  Yes.

(Scherer Dep. 91–92.)

Finally, in Scherer's Declaration he stated that, knowing he would be leaving Shamrock, he "formed [his] own corporation, Scherer Utility Sales[,] on September 28, 2011 and did in fact thereafter[] contact PTI in an attempt to establish an independent relationship with them." (Scherer Decl. ¶ 20.)  He further declared that "[w]hile [he] was employed with Plaintiff, the foregoing relationship with PTI was the only time [he] ever attempted to do any business on [his] own behalf."  (*Id.* ¶ 21.)  Thus, whether or not there was a signed contract between any Defendant and PTI before Scherer resigned from Shamrock, there is simply no dispute about whether Scherer worked with PTI on behalf of himself while still employed at Shamrock. Further, the undisputed evidence shows that Scherer did not disclose the October 2011 transactions with PTI to Shamrock.  (Pl.'s 56.1 ¶ 45; Defs.' 56.1 ¶ 45.)  Instead, Scherer "specifically instructed both PTI and Con Edison to delete Shamrock Power's name from the purchase orders, and in several follow up emails reiterated that request and cautioned Con Edison . . . 'please do not send [purchase orders] to Shamrock.'"  (Pl.'s 56.1 ¶ 45 (second alteration in original); *see also* Defs.' 56.1 ¶ 45; Smith Decl. Ex. O (PTI Transaction Emails).)

Second, Scherer solicited business for himself/his own company while at an event in the capacity of a Shamrock representative.  In particular, "[i]n January 2012, Shamrock Power paid for Scherer to attend an industry trade show called Distributech in Texas," and although "at that time he was still an employee of Shamrock Power, at the conference Scherer approached manufacturers regarding having Scherer Utility Sales, not Shamrock Power, serving as their representative, and provided his contact information to those manufacturers."  (Pl.'s 56.1 ¶ 47; Defs.' 56.1 ¶ 47.)  "At least one manufacturer followed up on Scherer's proposal via email on February 17, 2012," noting that Scherer had expressed interest in representing Custom Utility and telling Scherer to contact him if he was still interested.  (Pl.'s 56.1 ¶ 48; Defs.' 56.1 ¶ 48.)

Scherer responded on February 21, 2012, "with an email bearing the signature block for 'Scherer Utility Sales' and [which email] indicated that he was 'still interested in representing [Custom Utility] in the New York and New Jersey area.'" (Pl.'s 56.1 ¶ 49; Defs.' 56.1 ¶ 49.)

### 7.  October 2012 Advance

Scherer was guaranteed a minimum annual salary of $65,000, which was credited against commissions he earned, as well as a bonus based on commissions. (Pl.'s 56.1 ¶ 30; Defs.' 56.1 ¶ 30; *see also* Scherer Decl. ¶ 15 (indicating bonus was based on earned sales commissions).)

On March 2, 2012, Andrew McMahon sent Scherer an email stating that

> The bonus will be paid at the end of the year as with all Shamrock Power Sales LLC[] employees.  All bonuses will be paid to employees who are currently employed as [of] December 31 of the payroll year.  The bonus going forward will be paid on sales at the discretion of the company.

(Smith Decl. Ex. K (Salary Email); *see also* Pl.'s 56.1 ¶ 53; Defs.' 56.1 ¶ 53.)

In late September 2012, Scherer requested a $20,000 advance from Shamrock Power. (Pl.'s 56.1 ¶ 54; Defs.' 56.1 ¶ 54.)[19]  Shamrock gave Scherer a check for $19,528.42, which was deposited into Scherer's account at First Niagara Bank and cleared Shamrock's bank account on October 7, 2012. (Pl.'s 56.1 ¶ 56; Defs.' 56.1 ¶ 56; Scherer Dep. 69–70.)[20]  "On October 8, 2012, the day after he received the advance, Scherer abruptly resigned from Shamrock Power by

---

[19] In his Declaration, Scherer seems to assert that this money was not an advance, but rather was the payment of back-owed commission payments.  (Scherer Decl. ¶ 17 (declaring that "Plaintiff's contention that the $19,528.43 paid to me was a 'salary advance' is false" and that it was instead commission payments from previous years).)  However, Defendants do not dispute that this was a salary advance in their Rule 56.1 statement.  (*See* Defs.' 56.1 ¶ 54 (stating that Scherer asked for a salary advance).)  Furthermore, at his deposition, Scherer testified to the fact that it was an advance, and therefore he cannot create a material issue of fact by asserting something to the contrary in a declaration.  (*See* Scherer Dep. 69 ("Q:  So was this the advance that Shamrock Power gave you?  A:  Yes.").)

[20] It is not clear why the check was for $19,528.42, rather than for $20,000.

calling and leaving a voice mail message for the company's President, Andrew McMahon."
(Pl.'s 56.1 ¶ 57; *see also* Defs.' 56.1 ¶ 57.)  There are two points of contention between the
Parties regarding this payment: whether Scherer falsely represented that he needed the advance
to buy his wife a car as an anniversary gift, and whether there was a Shamrock policy requiring
advances on bonuses to be repaid if the person receiving the advance quits before the end of the
year.  The Court will address the evidence on each of these issues in turn.

     First, Plaintiff cites evidence that, with respect to the request for funds in September
2012, "Scherer informed Shamrock Power that he needed the advance so that he could buy his
wife a car as [a] 25th wedding anniversary gift."  (Verified Compl. ¶ 19 (Dkt. No. 1).)[21]
Defendants purport to dispute this, (*see* Defs.' 56.1 ¶ 54), but cite no evidence to the contrary.
Rather, Defendants assert that Scherer was owed back commission payments, and that
"McMahon said he would look into [it] and never got back to Scherer," and therefore "Scherer
chose to ask for the advance."  (Defs.' 56.1 ¶ 54.)  This statement does not directly refute
Plaintiff's contention that Scherer stated he needed an advance to buy the car, and Defendants'
response that "Scherer disputes the allegation that he told McMahon that [he] was going to buy
his wife a car with an advance," is not supported by any of the sources cited.  (*Id.*)[22]  Thus, the
undisputed evidence shows that Scherer told Shamrock he needed the advance to buy his wife a
car.  As noted above, the check cleared Shamrock's account on October 7, 2012, and Scherer

---

[21] This Complaint was verified under penalty of perjury by Andrew McMahon, who
certified, based on personal knowledge, "that the factual allegations of the foregoing Verified
Complaint are true except for those allegations based upon information and belief."  (Verified
Compl., at unnumbered 27.)  *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (treating
verified complaint like affidavit for summary judgment purposes).

[22] Plaintiff does not offer any direct evidence showing that Plaintiff relied on Scherer's
representation regarding the purchase of the car in deciding to give him the advance.

resigned on October 8, 2012.  Since resigning, Scherer has not used the $19,582.42 to buy a car, but rather the funds were disseminated into his bank accounts and used to support himself and his new business, Scherer Utility.  (Pl.'s 56.1 ¶ 59; Defs.' 56.1 ¶ 59.)

The second point in contention is whether there was a Shamrock policy that an employee who received an advance of a year-end bonus, but left before the end of the year, was required to repay the bonus, as Plaintiff urges.  Defendants argue that no such policy existed, but their assertions are not supported by any relevant citations to the record.  (*See, e.g.*, Defs.' 56.1 ¶¶ 39, 40, 55.)  Plaintiff, on the other hand, cites the Salary Email, where Andrew McMahon informed Scherer that bonuses "will be paid to employees who are currently employed as [of]  December 31 of the payroll year."  (*See* Pl.'s 56.1 ¶ 53; Smith Decl. Ex. K (Salary Email).)  Additionally, Scherer's salary history reflects the fact that bonuses were paid in December, except for occasional advances and except for the 2009 commission check which was initially paid on December 31, 2009 but was later supplemented on March 8, 2010 and again on August 27, 2010, and the 2007 commission check which was initially paid on December 31, 2007 and then supplemented on May 19, 2008.  (*See* Second Decl. of Elizabeth Mott Smith in Supp. of Mot. for Partial Summ. J. ("Smith Reply Decl.") Ex. CC ("Scherer Salary History") (Dkt. No. 81); Defs.' 56.1 ¶ 31 (citing Scherer Decl. Ex. N (pay stubs from May 19, 2008 and March 8, 2010).)[23] Additionally, Scherer admitted that the bonuses were paid around December, as he stated in his Declaration that "he originally planned to leave Shamrock Power 'in January 2012 after [he] received [his] end of the year commission.'"  (Shamrock Power Sales, LLC's Consolidated Rule 56 Statement and Obj. to Defs.' Statement of Disputed Material Facts in Opp'n to Partial Mot.

---

[23] The Scherer Salary History document was initially attached to Smith's Declaration as Exhibit L, but was missing a page.

for Summ. J. ("Pl.'s Reply 56.1") ¶ 31 (Dkt. No. 80) (quoting Scherer Decl. ¶ 19).)  Indeed, even

in opposing Plaintiff's Rule 56.1 statement, Defendants state that the bonuses were due on

December 31.  (Defs.' 56.1 ¶ 31 (stating that bonuses due on December 31, 2007 and December

31, 2009 were not paid in full on those dates).)

 Finally, the Court also notes that there is some evidence that this advance was a payroll

advance rather than an advance against commissions.  Shamrock's records of Scherer's salary

history state that this paycheck was a "2012 Payroll Advance," while some other advances have

the notation "Advance on Commission 2011" or "Advance of Commission for 2008."  (*See*

Smith Reply Decl. Ex. CC at 2–3.)

### 8.  Scherer's Resignation from Shamrock

 In March 2012, following a dispute between Scherer and Shamrock regarding pay,

Scherer stopped responding to correspondence from Shamrock.  (*See* Pl.'s 56.1 ¶ 50; Defs.' 56.1

¶ 50.)  After not hearing from Scherer for a week, Andrew McMahon "traveled to Scherer's

home to determine why Scherer was not responding to communications or otherwise performing

work for Shamrock Power."  (Pl.'s 56.1 ¶ 51; *see also* Defs.' 56.1 ¶ 51.)  Although Andrew

McMahon was prepared to fire Scherer for abandoning his job responsibilities, Scherer

"persuaded McMahon to continue his employment, promising that he was 'loyal' to Shamrock

Power and would never leave," and Shamrock agreed to retain him.  (Pl.'s 56.1 ¶ 52; *see also*

Defs.' 56.1 ¶ 52.)  Approximately seven months later, on October 8, 2012, Scherer resigned from

Shamrock leaving a voicemail message.  (*See* Pl.'s 56.1 ¶ 57; Defs.' 56.1 ¶ 57.)  In the message,

Scherer stated that McMahon could recover the laptop, smart phone, and other property owned

by Shamrock from the company car that had been issued to Scherer, and that Scherer had left the

car unlocked with the keys inside it in front of his home.  (Pl.'s 56.1 ¶ 60; Defs.' 56.1 ¶ 60.)

"When McMahon retrieved the laptop and other company property left in the unlocked company car, he discovered that several items that Shamrock Power had entrusted to Scherer were missing, including Client samples and a confidential Manufacturer Reference Guide." (Pl.'s 56.1 ¶ 61; *see also* Defs.' 56.1 ¶ 61.)  Upon examining the laptop, Shamrock learned that client and customer information and industry contacts stored on the laptop had been deleted by Scherer.  (Pl.'s 56.1 ¶ 62; PI Tr. 73–74; Answer ¶ 54.)[24]  The data Scherer deleted from Shamrock's laptop included licensed software, email correspondence, client and customer files and information, including confidential contact information, invoices, orders, and contracts. (Pl.'s 56.1 ¶ 72; PI Tr. 74.)[25]  Shamrock also discovered that Scherer had deleted all of the client and customer contact data from his company-issued cellular smart phone.  (Pl.'s 56.1 ¶ 63; Defs.' 56.1 ¶ 63.)

Scherer also retained various data and documents from Shamrock.  First, prior to deleting the data from Shamrock's laptop and cell phone, Scherer made copies for himself to retain. (Pl.'s 56.1 ¶ 64; Defs.' 56.1 ¶ 64.)  The data and emails copied from the laptop included proprietary price lists for Shamrock's clients.  (Pl.'s 56.1 ¶ 66; PI Tr. 90–91.)[26]  Scherer also

---

[24] Defendants dispute only that a "confidential customer contact list existed on the computer," but this assertion is not relevant here.  (*See* Defs.' 56.1 ¶ 62.)

[25] Defendants dispute only that the contact information is confidential and that Scherer deleted any email correspondence, asserting that there were no emails stored on the laptop's hard drive.  (Defs.' 56.1 ¶ 72.)  However, Defendants provide no citation to evidence that supports either of these contentions.  With regard to the assertion that email was not saved on the laptop's hard drive, Defendants cite only to Scherer's Declaration.  (*See* Defs.' 56.1 ¶ 66.)  However, nothing in the Declaration supports this finding.  With regard to the confidentiality of the client contact information, Defendants' assertions are not supported by evidence in the record, as discussed above.

[26] Defendants dispute this, saying that no emails were saved on the laptop hard drive, and none were copied, and citing Scherer's Declaration.  (Defs.' 56.1 ¶ 66.)  For the reasons discussed above, the Court disregards this assertion.

retained, and withheld from Shamrock Power, client and customer emails, communications, and other data belonging to Shamrock.  (Pl.'s 56.1 ¶ 65; Defs.' 56.1 ¶ 65.)

### 9.  Scherer's Activities Post-Resignation from Shamrock

Within weeks of resigning from Shamrock, Scherer had a line card on his website, and claimed to be representing approximately thirteen manufacturers, including five of Shamrock Power's former clients, and eight other manufacturers who competed directly with Shamrock Power's clients.  (Pl.'s 56.1 ¶ 75; *see also* PI Tr. 46–47; Smith Decl. Ex. S; Smith Reply Decl. Exs. BB, DD.)[27]  Based on Andrew McMahon's experience, it "would have been impossible for Defendants to have secured manufacturer's representation agreements with so many clients unless [Scherer] had started the process well before he resigned from Shamrock Power."  (Pl.'s 56.1 ¶ 76; *see also* PI Tr. 48–49.)[28]

---

[27] In Plaintiff's Rule 56.1 statement, Plaintiff cited as evidence of this assertion Exhibit S to the Smith Declaration, a screenshot of Plaintiff's Web site from December 19, 2012. Defendants point to this, as well as the dates of the representative agreements contained in Exhibit V to the Smith Declaration, as evidence that the time frame in which Scherer developed clients was a little longer (six to eight weeks).  (Defs.' 56.1 ¶ 75.)  In reply, Plaintiff offers more evidence disproving Defendants' conclusory assertion.  In particular, Exhibit BB to Smith's Reply Declaration is an email dated October 18, 2012, listing ten manufacturers and a possible eleventh.  (*See* Smith Reply Decl. Ex. BB.)  Exhibit DD to Smith's Reply Declaration contains emails dated October 12, 2012, wherein Scherer states that he has "roughly 12 companies," and attaches a draft line card listing a number of manufacturers and indicating others were potential clients.  (*See id.* Ex. DD, at unnumbered 2–3.)  Therefore, the Court dismisses Defendants' unsubstantiated assertions regarding the slightly longer time frame, but the dispute is, in any event, immaterial.

[28] Defendants oppose this in their Rule 56.1 statement, stating that Scherer started the process the first day he quit Shamrock by sending out emails and by searching the internet and tradeshow websites for manufacturers, but they do not cite to any other evidence corroborating Scherer's assertion.  (Defs.' 56.1 ¶ 76.)  Moreover, this claim is contradicted by Scherer's admission that he started Scherer Utility over a year before he suddenly left Shamrock, and that he attempted to establish an independent relationship with PTI and solicited business at a trade show while still employed at Shamrock.  (Scherer Decl. ¶¶ 20–21; Scherer Dep. 91–92; Pl.'s 56.1 ¶¶ 47–48, 57; Defs.' 56.1 ¶¶ 47–48, 57.)

Since Scherer left Shamrock, four manufacturers have informed Shamrock that they were terminating their exclusive representation contracts with Shamrock and would be instead contracting with Scherer for the same services previously being provided by Shamrock. (*See* Pl.'s 56.1 ¶¶ 77–78; PI Tr. 47–48; Defs.' 56.1 ¶¶ 77–78.) These manufacturers informed McMahon that they were leaving because Scherer contacted them and told them that McMahon did not have contacts with the customers so they should go with Scherer if they wanted to maintain sales. (Pl.'s 56.1 ¶ 79; Defs.' 56.1 ¶ 79; PI Tr. 47–48.)

Furthermore, after resigning from Shamrock, Scherer responded to email correspondence and customer inquiries despite the fact that those communications were intended for Shamrock, not Defendants. (Pl.'s 56.1 ¶ 65; Defs.' 56.1 ¶ 65.) And, on October 8, 2012, the day that Scherer resigned, he sent emails from the jscherer15@msn.com email address to some Shamrock clients, using the confidential information he had obtained from Shamrock, informing them that "he had resigned from Shamrock Power but 'would like to continue [his] professional representation of [them] and [their] compan[ies] in the New York and New Jersey area via [his] new company.'" (Pl.'s 56.1 ¶ 74; Second Am. Compl. ¶ 44; Answer ¶ 2.)[29]

### 10.  Defendants' Violations of Court Orders

On December 11, 2012, the Court issued a temporary restraining order ("TRO") against Scherer and Scherer Utility, enjoining them from directly or indirectly, alone or in concert with others, from, among other things, using or disclosing Shamrock's confidential, proprietary, or trade secret information; soliciting or otherwise initiating any further contact or communication

---

[29] Defendants dispute only that the manufacturers are confidential, (Defs.' 56.1 ¶ 74), but say nothing about the plethora of proprietary information related to the manufacturers, including some information that Shamrock was contractually obligated to keep confidential, (*See* Pl.'s 56.1 ¶¶ 13, 61, 65).

with any Shamrock customer; making false or misleading statements to any person regarding

Shamrock; and hiding, damaging, or destroying Shamrock's confidential, proprietary and trade-

secret information.  (Pl.'s 56.1 ¶ 80; Defs.' 56.1 ¶ 80.)  The Court also directed Defendants to

immediately return all copies of any computer files and other confidential records they had taken

from Shamrock and to immediately cease all use of the email address jscherer15@msn.com for

commercial purposes.  (Pl.'s 56.1 ¶ 80; Defs.' 56.1 ¶ 80.)  After the Court imposed the TRO,

Scherer, Tilearcio, and Scherer Utility, acting in concert, took steps to circumvent the Order by

emailing Shamrock's clients and customers, falsely representing that Scherer was having

"issues" with the jscherer15@msn.com account, and directing them to instead communicate with

Defendants through Tilearcio's email account, ptillie@msn.com.  (Pl.'s 56.1 ¶ 81; Defs.' 56.1

¶ 81.)

       Plaintiff moved for a preliminary injunction and, following a hearing, the Court issued a

preliminary injunction on December 27, 2012 stating that

> Defendants are preliminarily enjoined, whether directly or indirectly, alone or in
> concert with others, from . . . [u]sing, disclosing, misusing or further converting
> Shamrock Power's confidential, proprietary or trade secret information, including,
> but not limited to, customer contracts, customer contacts, pricing information,
> passwords and access codes for customer websites and other confidential software
> and customer information.

(*See* Pl.'s 56.1 ¶ 82; Defs.' 56.1 ¶ 82.)  Shortly thereafter, on January 3, 2013, Scherer formed a

new business, Storm King, to provide services substantially the same as those provided by

Scherer Utility.  (*See* Pl.'s 56.1 ¶ 83; Defs.' 56.1 ¶ 83.)  Scherer then, with the knowledge and

consent of Tilearcio, transferred its contracts with manufacturers and accounts receivable to

Storm King.  (Pl.'s 56.1 ¶ 84; Scherer Dep. 110–16 (explaining that, after forming Storm King,

Scherer transferred Scherer Utility's contracts to Storm King without consideration).)

Scherer (and later Storm King) has represented competitors to Shamrock's clients/customers, as well as previous clients/customers.  For example, Scherer Utility represented Rohn Products LLC ("Rohn"), a manufacturer of transmission towers, and then transferred this representation to Storm King without consideration.  (Pl.'s 56.1 ¶ 85; Defs.' 56.1 ¶ 85.)  Rohn, which is Storm King's client and previously was Scherer Utility's client, is a direct competitor to Sabre Tubular Systems ("STS"), a former Shamrock client in the transmission tower market.  (*See* Pl.'s 56.1 ¶ 86; Decl. of Andrew McMahon ("McMahon Decl.") ¶ 7 (Dkt. No. 26).)[30]  Scherer represented STS while at Shamrock and therefore had direct knowledge of its confidential pricing information and blanket contracts for transmission towers sold to Shamrock's Customer PSE&G.  (Pl.'s 56.1 ¶ 87; McMahon Decl. ¶ 8.)[31]  Shamrock also represents Estex Manufacturing Company ("EMC"), a manufacturer of arc suppression blankets.  (Pl.'s 56.1 ¶ 88; Defs.' 56.1 ¶ 88; McMahon Decl. ¶ 10.)  While employed by Shamrock, Scherer made presentations on behalf of EMC to Shamrock's customer contact at National Grid.  (Pl.'s 56.1 ¶ 89; McMahon Decl. ¶ 11.)[32]  Since resigning from Shamrock, Scherer, Scherer Utility,

---

[30] Defendants contest this, stating that STS terminated its relationship with Shamrock in May 2011.  (Defs.' 56.1 ¶ 86.)  In other words, this is not a denial, as Plaintiff noted that STS was a former client.  Also this statement ignores the fact that Scherer possessed proprietary information about STS.  (*See id.*)

[31] Defendants purport to dispute this, but their opposition is non-responsive and contains no citations.  (Defs.' 56.1 ¶ 87.)

[32] Plaintiff also asserts that Scherer, through a confidential bid process, submitted a bid to National Grid on behalf of EMC to provide arc suppression blankets, which bid included EMC's confidential pricing information.  (Pl.'s 56.1 ¶ 89; McMahon Decl. ¶ 11.)  Defendants dispute this, stating that they "believe an inside sales person at Shamrock submitted the pricing," citing to Scherer's Declaration.  (Defs.' 56.1 ¶ 89.)  Scherer's Declaration states that clerical staff submitted the bid.  (Scherer Decl. ¶ 36.)  Thus, while this may be an exercise in semantics, there is an issue of fact as to whether Scherer, or somebody working for him, submitted the bid.  However, this dispute is immaterial.

and Storm King have represented, at least at some point, Energy Products, LLC, which manufactures manhole covers and arc suppression blankets, and is a direct competitor of Shamrock's client, EMC.  (Pl.'s 56.1 ¶ 90; Defs.' 56.1 ¶ 90.)  Additionally, on December 10, 2012, Defendants reached out to Shamrock's customer contacts at National Grid, on behalf of their new client, Energy Products.  (Pl.'s 56.1 ¶ 91; Defs.' 56.1 ¶ 91.)  Scherer previously represented EMC, but nonetheless asked to meet with the National Grid representatives to pitch Energy Product's competing product.  (*See* Pl.'s 56.1 ¶ 91; Defs.' 56.1 ¶ 91.)  Defendants scheduled a meeting with the National Grid representative for January 9, 2013 to discuss the competing blast mats and, due to the inside knowledge he gained at Shamrock regarding EMC's pricing and commission schedule, Scherer had the ability to under-bid EMC by a slim margin and win the contract.  (Pl.'s 56.1 ¶ 92; McMahon Decl. ¶¶ 14–15.)[33]

On January 15, 2013, Shamrock moved for Defendants to be held in contempt of the preliminary injunction.  (Pl.'s 56.1 ¶ 93; Defs.' 56.1 ¶ 93.)  At the hearing, Defendants conceded that they violated the Court's preliminary injunction and represented that they were "going out of business totally."  (Pl.'s 56.1 ¶ 94; Defs.' 56.1 ¶ 94.)  The Court issued a finding of contempt, and ordered that Defendants "immediately begin the process of canceling all current contracts with their manufacturers/clients," and also terminate the contracts as soon as practicable, and to pay into an escrow account held by McCarter & English LLP all commissions or other funds they have received from manufacturers/clients since October 1, 2012, or receive in the future, until further order of the Court.  (Pl.'s 56.1 ¶ 94; Defs.' 56.1 ¶ 94.)  Defendants have never

---

[33] Defendants object, stating: "Scherer disputes the allegation that there are no other manufacturers involved in this approval process and that EMC and Energy Products are the only manufacturers submitting bids.  Most likely other manufacturers were involved and were submitting bids."  (Defs.' 56.1 ¶ 92.)  Defendants do not provide any citations to support these speculative comments.

sought modification or appellate review of the Contempt Order.  (Pl.'s 56.1 ¶ 96; Defs.' 56.1 ¶ 96.)  Defendants have also violated the Contempt Order by canceling and then reinstating contracts with the same entities with whose contracts the Court directed Defendants to terminate. (*See* Pl.'s 56.1 ¶ 97; Smith Decl. Ex. G (Defs.' Feb. 2013 Discovery Responses) ¶ 45 (stating that Defendants canceled all contracts effective February 2013, but that, since May 20, 2013, Storm King entered into contracts with Awesense Wireless, Inc. Electir-Glass, Evluma, Bierer & Associates, Telliformer Smartgrid Solutions, Inc., Bethea Too and Equipment Company, Inc., Bridgeport Magnetics Group, Custom Plastics, Inc., Elliott Industries, Inc., Grid Sentry, Inc., Electroline Corporation, Kortick Manufacturing Company, Mackay Communications, New England Ropes Corp., Rohn Products LLC, Product Sales International. Telematics Wireless, LTD., Tiiger, Inc., Tower Solutions Inc., Trenwa Inc., Wagner Technical Services, Inc., Uticom Systems Inc., and Utility Composite Solutions International, Inc.).)[34]  Furthermore, Defendants have violated the Contempt Order by receiving commissions and other funds from the contracts they have reinstated and by failing to pay those funds into the escrow account.  (*See* Pl.'s 56.1 ¶ 98; Smith Decl. ¶ 5.)[35]  Moreover, Defendants have continually violated the Court's injunction

---

[34] Defendants purport to dispute that Scherer violated the Contempt Order by stating that "Scherer chose to reestablish Storm King Power Sales without any of Shamrock's previous manufacturers." (Defs.' 56.1 ¶ 97.)  However, the Contempt Order required Defendants to "immediately begin the process of canceling all current contracts with their manufacturers/clients," and did not specify that Defendants needed only to cancel contracts with Shamrock's previous manufacturers/clients.  (*See* Contempt Order ¶ 4 (Dkt. No. 32).)  Therefore, Defendants' claim is unpersuasive.

[35] Defendants again dispute this, stating that the commissions earned were on sales made with manufacturers that were never associated with Shamrock.  (Defs.' 56.1 ¶ 98.)  However, the Contempt Order instructed Defendants to pay into an escrow account held by McCarter & English, LLP "all commissions or other funds they have received from manufacturers/clients since October 1, 2012 or receive in the future," and does not limit this requirement to funds earned from Shamrock's previous manufacturers/clients.  (Contempt Order ¶ 5.)

by using Shamrock's customer contact information to pitch competing products to engineers whose identities Defendants would not know of except through Scherer's prior employment with Shamrock.  (Pl.'s 56.1 ¶ 99; Smith Decl. Ex. M (Defs.' Apr. 2013 Discovery Responses), at unnumbered 10–13 (indicating sales to Shamrock Customers Con Edison, Graybar, and Orange and Rockland).)[36]  Plaintiff also continues to lose business to Defendants due to their theft of Shamrock's emails and contact and contract information related to Shamrock's clients and customers.  (Pl.'s 56.1 ¶ 100.)

Finally, Defendants have consistently maintained that they lack the financial resources to pay a significant judgment to Shamrock.  (Pl.'s 56.1 ¶ 111; Defs.' 56.1 ¶ 111.)

B.  Procedural Background

Plaintiff filed suit on December 10, 2012.  (Dkt. No. 1.)  On December 11, 2012, the Court issued the TRO discussed above.  (*See* Dkt. (minute entry for Dec. 11, 2012).)  The TRO specifically enjoined Defendants whether directly or indirectly, alone or in concert with others, from:

> i. Using, disclosing, misusing or further converting Shamrock Power's confidential, proprietary or trade secret information, including, but not limited to, customer contracts, customer contacts, pricing information, passwords and access codes for customer websites, and other confidential software and customer information;
>
> ii.  Soliciting or otherwise initiating any further contact or communication with any Shamrock Power customer for the purpose of inviting, encouraging or requesting the transfer of any account or business patronage from Shamrock Power;
>
> iii.  Making false or misleading statements to any person or entity regarding Shamrock Power's business, employees, intellectual property rights or customer relationships; [and]

---

[36] Defendants dispute only that the identities of contacts at utilities are confidential.  (*See* Defs.' 56.1 ¶ 99.)  However, this assertion fails for the reasons discussed herein.

> iv.  Hiding, damaging, destroying or otherwise disposing of or making unavailable for further proceedings in this matter any of Shamrock Power's confidential, proprietary or trade secret information[.]

(Order (Dkt No. 3).)  The TRO further directed Defendants to "immediately return to Shamrock Power all copies of any computer files or electronic records and any confidential, proprietary and trade secret information they obtained and/or removed from Shamrock Power," and directed Scherer to "immediately cease all use of the email address jscherer15@msn.com for commercial purposes involving Scherer Utility," and to immediately provide to Shamrock "all e-mails to the address scherer15@msn.com relating to sales of high voltage power equipment and representation of manufacturers of high voltage products from current or former Shamrock Power Customers."  (*Id.*)  The Court ordered that the TRO would be in effect until further order, and required Plaintiff to pay a $5,000 bond, (*see id.*), which Plaintiff posted on December 13, 2012, (*see* Dkt. (minute entry for Dec. 14, 2012).)

At the December 11 hearing, the Court also set a briefing schedule for Plaintiff's motion for a preliminary injunction.  (*See* Dkt. (minute entry for Dec. 11, 2012).)  Plaintiff filed papers in support of the preliminary injunction, (*see* Dkt. Nos. 6–7, 9–10), and Defendants filed papers in opposition, (*see* Dkt. No. 28).  On December 21, 2012, the Court conducted a full evidentiary hearing on Plaintiff's motion for a preliminary injunction, (*see* Dkt. No. 16 (describing hearing held on Dec. 21, 2012)), after which the Court issued a preliminary injunction.  The Order preliminarily enjoined Defendants, whether directly or indirectly, alone or in concert with others, from:

> i. Using, disclosing, misusing or further converting Shamrock Power's confidential, proprietary or trade secret information, including, but not limited to, customer contracts, customer contacts, pricing information, passwords and access codes for customer websites, and other confidential software and customer information;

ii.  Soliciting or otherwise initiating any further contact or communication with any Shamrock Power customer through use [of] Plaintiff's trade secrets for the purpose of inviting, encouraging or requesting the transfer of any account or business patronage from Shamrock Power;

iii.  Making false or misleading statements to any person or entity regarding Shamrock Power's business, employees, intellectual property rights or customer relationship; and

iv.  Hiding, damaging, destroying or otherwise disposing of or making unavailable for further proceedings in this matter of any of Shamrock Power's confidential, proprietary or trade secret information[.]

(*See* Prelim. Inj. Order 2–3 (Dkt. No. 17).)  The Court also issued the following orders:

[] The Defendants are directed to immediately return to Shamrock Power all equipment, samples, property and copies of any computer files or electronic records and any confidential, proprietary and trade secret information they obtained and/or removed from Shamrock Power by no later than December 28, 2012;

[] The Defendants are directed to produce to Shamrock Power by no later than January 4, 2013, all e-mails to or from the address jscherer15@msn.com that are to or from current or former Shamrock Power clients or customers that relate to sales of high voltage power equipment and the representation of manufacturers of high voltage products; and

[] The Defendants shall, immediately upon receipt, produce to Shamrock Power all future e-mails to the address jscherer15@msn.com that relate to Shamrock Power's trade secret information.

(*Id.* at 3–4.)  The Court also increased Plaintiff's bond requirement to $50,000.  (*See* Order (Dkt. No. 16).)

On January 3, 2013, Plaintiff filed its First Amended Complaint.  (*See* Dkt. No. 21.) Then, on January 16, 2013, Plaintiff filed an order to show cause as to why Defendants should not be held in contempt of the Preliminary Injunction Order, and filed accompanying documents on January 18, 2013.  (*See* Dkt. Nos. 24–27.)  Defendants did not object to a finding of contempt. (*See* Contempt Order, at unnumbered 2 (Dkt. No. 32).)  Following a show cause hearing held on January 31, 2013, (*see* Dkt. (minute entry for Jan. 31, 2013)), the Court issued an order holding

Defendants in contempt, (Dkt. No. 32).  The Contempt Order ordered and adjudged the

following:

> 1.  Defendants are in contempt of the December 27, 2012 Order.

> 2.  The December 27, 2012 Order remains in effect until further order of this Court.

> 3.  The Defendants are directed to comply with the Court's December 27, 2012 Order by not later than 5:00 p.m. on Friday, February 8, 2013.

> 4.  Defendants shall immediately begin the process of canceling all current contracts with their manufacturers/clients.  Those contracts are to be terminated as soon as practicable, taking into consideration any notice requirements.

> 5.  Defendants are directed to pay into an escrow account held by McCarter & English, LLP, all commissions or other funds they have received from manufacturers/clients since October 1, 2012 or receive in the future, and McCarter & English, LLP shall hold such funds in escrow until further order of this Court.

> 6.  The $50,000 bond posted by Shamrock Power is hereby released.

(Contempt Order, at unnumbered 2–3.)  The Court reserved on deciding what sanctions to

impose on Defendants for their contempt.  (*Id.* at unnumbered 3.)

On July 12, 2013, Plaintiff filed a Second Amended Complaint, adding Tilearcio and

Storm King Power Sales as Defendants.  (*See* Dkt. No. 41.)  Defendants answered, and one

Defendant, John Scherer, asserted counterclaims against Plaintiff, (Dkt. No. 48), which Plaintiff

then answered, (Dkt. No. 49).

Following the close of discovery, Plaintiff filed a Motion for Partial Summary Judgment,

(Dkt. No. 69), a Rule 56.1 Statement, (Dkt. No. 71) (App.)), a Memorandum of Law in Support

of Plaintiff's Motion for Partial Summary Judgment, (Dkt. No. 70), a Declaration by Smith, with

attachments, (Dkt. No. 71), and a Declaration by McMahon, with attachments, (Dkt. No. 72).

Defendants filed a Declaration by Scherer, with attachments, (Dkt. No. 76), a declaration by

Rones ("Rones Declaration") (Dkt. No. 77), and a counter-Rule 56.1 Statement, with

attachments, (Dkt. No. 78).  Defendants did not file a memorandum of law in opposition.

Finally, Plaintiff filed a Reply Memorandum in Further Support of Plaintiff's Motion for Partial

Summary Judgment, (Dkt. No. 79), a Reply 56.1, (Dkt. No. 80), and a Reply Declaration by

Smith, with attachments, (Dkt. No. 81).

Plaintiff also filed a Motion to Strike certain documents included by Defendants, certain

paragraphs in Scherer's Declaration, (Dkt. No. 76), and the Rones Declaration, (Dkt. No. 77), as

well as a Memorandum of Law in Support, (Dkt. No. 83).  Pursuant to the schedule set by the

Court on October 9, 2014, Defendants were to file their opposition by December 19, 2014.  (*See*

Dkt. (minute entry for Oct. 9, 2014).)  On April 17, 2015, four months after Defendants'

opposition was due, the Court scheduled argument for June 30, 2015.  (Dkt. No. 84.)  On June

10, the Parties asked the Court to adjourn oral argument, citing a scheduling difficulty, (Dkt. No.

88), and the Court canceled the argument, (Dkt. No. 89).  On July 31, 2015, more than seven

months after their opposition was due, Defendants requested a thirty-day extension to respond to

Plaintiff's Motion to Strike, claiming that they did not respond because they were anticipating

oral argument.  (Dkt. No. 90.)  Despite noting that Defendants' contentions were not credible, the

Court gave Defendants until August 7, 2015 to file opposition to Plaintiff's Motion to Strike, and

gave Plaintiff until August 14, 2015 to file a reply.  (Dkt. No. 92.)  On August 7, 2015,

Defendants submitted three declarations in opposition to the Motion to Strike, one from Rones,

one from Tilearcio, and one from Scherer.  (Dkt. Nos. 93–95.)  Although Defendants only

requested, and were only granted, permission to file opposition to Plaintiff's Motion to Strike,

(*see* Dkt. No. 92), much of Scherer's supplemental declaration and all of Tilearcio's

supplemental declaration address Plaintiff's Motion for Partial Summary Judgment.  (*See* Decl.

of Patrice T[i]learcio in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Tilearcio Decl.") ¶¶ 1–5 (Dkt.

No. 94); Decl. of John K. Scherer in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Scherer Supp. Decl.") ¶¶ 5–22 (Dkt. No. 93).)  This conduct by Defendants and defense counsel is completely inappropriate, as well as unfair to Plaintiff and Plaintiff's counsel, and there is no basis for the Court to consider the materials submitted in assessing Plaintiff's Motion for Partial Summary Judgment.  Nevertheless, as noted above, because the additional evidence does not create any material fact disputes, the Court considers it anyway, where relevant.  In addition, Plaintiff filed a Reply to the Declarations of John Scherer, Patrice Tilearcio, and Kenneth Rones in Opposition to Plaintiff's Motion for Summary Judgment, (Dkt. No. 96), on August 14, 2015.

Finally, and not at issue here, Defendants filed a Motion to Compel Production of Documents from Plaintiff Shamrock Power Sales, (Dkt. No. 68), which Plaintiff opposes, (Dkt. No. 73).  However, because the Motion to Compel concerns discovery related to Scherer's counterclaims against Plaintiff, which are not at issue in this Motion for Summary Judgment, the Court will rule separately on the Motion to Compel.

## II.  Discussion

### A.  Materials Considered in Deciding this Motion

Plaintiff filed a Motion to Strike certain materials submitted by Defendants.  (*See* Dkt. Nos. 82–83.)  In particular, Plaintiff moves to strike Exhibits D, E, F, G, L, M, N, P, R, T, U, X, DD, II, JJ, KK, NN, OO, and TT to Scherer's Declaration, as well as paragraphs 3 to 12, 14 to 18, 21 to 24, 26 to 31, 33 to 36, and 38 of Scherer's Declaration.  Additionally, Plaintiff moves to strike the Rones Declaration in its entirety.  As noted above, Defendants requested permission to file their opposition to Plaintiff's Motion to Strike seven months after it was due, which the Court granted.  (Dkt. No. 92.)  Defendants submitted three declarations: one from counsel, (*see* Decl. of Kenneth S. Rones in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Rones Supp. Decl.")

(Dkt No. 95)), one from Scherer, (Scherer Supp. Decl. (Dkt. No. 93)), and one from Tilearcio, (Tilearcio Decl. (Dkt. No. 94)).  Taking counsel's declaration first, Rones submitted a two-paragraph declaration, the first paragraph of which represented that he is Defendants' counsel and that he submits the declaration in opposition to Plaintiff's Motions.  (Rones Supp. Decl. ¶ 1.) The second paragraph of the declaration asserts that Defendants' submissions "raise substantial issues of material fact which warrant a denial of Plaintiff's Motion for Summary judgment as well as its Motion to Strike Portions of Defendants' Submission in Opposition."  (*Id.* ¶ 2.)  This bare legal assertion is not entitled to any weight and is therefore disregarded.  *See, e.g.*, *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014) (not crediting "legal conclusions or conclusory allegations" in Rule 56.1 statements or declarations); *Kuck v. Danaher*, No. 07-CV-1390, 2012 WL 4904387, at *7 (D. Conn. Oct. 16, 2012) ("It is axiomatic that a party must present facts not legal conclusions, personal belief, or speculation couched as facts to survive summary judgment."), *aff'd sub nom. Kuck v. Masek*, 542 F. App'x 75 (2d Cir. 2013).  The *only* material submitted by Defendants that at all addresses Plaintiff's Motion to Strike is Plaintiff's résumé, Exhibit G to Scherer's Declaration, which Defendants assert was authenticated at the preliminary injunction hearing.  (Scherer Supp. Decl. ¶¶ 3–4.)

When ruling on a motion for summary judgment, a district court should only consider evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)) (citing Fed. R. Evid. 602); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56

requires a motion for summary judgment to be supported with affidavits based on personal

knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419–20, 421 (S.D.N.Y. 2014)

(disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v.*

*Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for

admissibility is whether a reasonable trier of fact could believe the witness had personal

knowledge." (internal quotation marks omitted)); *Zigmund v. Foster*, 106 F. Supp. 2d 352, 356

(D. Conn. 2000) (noting that "[a]n affidavit in which the plaintiff merely restates the conclusory

allegations of the complaint" is insufficient to support a motion for summary judgment).

Relatedly, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated

speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *see also Alzawahra v. Albany*

*Med. Ctr.*, No. 11-CV-227, 2012 WL 5386565, at *1 (N.D.N.Y. Nov. 1, 2012) ("In this regard, a

party opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials asserted in the pleadings, or on conclusory allegations or unsubstantiated

speculation." (citation and internal quotation marks omitted)), *aff'd*, 546 F. App'x 53 (2d Cir.

2013).

      Furthermore, a "non-movant may not avoid summary judgment by proffering documents

that are not in admissible form." *White Diamond Co. v. Castco, Inc.*, 436 F. Supp. 2d 615, 624–

25 (S.D.N.Y. 2006). "Evidence that is not properly authenticated is not in admissible form and

therefore may not be considered in support of or in opposition to a summary judgment motion."

*Id.* For evidence to be admissible, it must be authenticated pursuant to Federal Rule 901. Under

Rule 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the

proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is." Fed. R. Evid. 901(a). Rule 901 provides several non-exhaustive

methods for authenticating evidence, for example "[t]estimony that an item is what it is claimed to be."  Under Rule 902, however, some evidence is self-authenticating, such as domestic public documents that are sealed and signed, domestic public documents that are signed and certified, foreign public documents, certified copies of public records, official publications, newspapers and periodicals, trade inscriptions, acknowledged documents, commercial paper and related documents, presumptions under a federal statute, certified domestic records of a regularly conducted activity, and certified foreign records of a regularly conducted activity.  Fed. R. Evid. 902.  Additionally, a non-moving party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial."  *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted); *see also Crippen v. Town of Hempstead*, No. 07-CV-3478, 2013 WL 1283402, at *11 (E.D.N.Y. Mar. 29, 2013) ("[I]nadmissible hearsay cannot raise a triable issue of fact sufficient to defeat a motion for summary judgment." (internal quotation marks omitted)).

Plaintiff moves to strike the following exhibits to Scherer's Declaration: Exhibit D, a collection of emails; Exhibit E, a collection of business cards; Exhibit F, a collection of documents; Exhibit G, a document which appears to be Scherer's résumé; Exhibits L, N, P, R, U, and X, which appear to be Scherer's pay stubs; Exhibits M, T, and DD, which appear to be emails between Scherer and McMahon; Exhibits II and JJ, emails between Scherer and someone named Michelle Ashe; Exhibit KK, a collection of documents and Web sites; Exhibit NN, a letter from Andres Franzese to McMahon; Exhibit OO, an email to Shamrock employees from McMahon about the letter contained in Exhibit NN; and Exhibit TT, which appears to be a collection of purchase orders.  Defendants provide no evidence to authenticate these documents,

as is required; indeed, Defendants do not even explain what these documents are, although the

substance of the documents is at times evident from the paragraphs referring to them in

Defendants' Rule 56.1 Statement, and Exhibit G was identified as Scherer's résumé in testimony

given by McMahon at the preliminary injunction hearing.  (*See* Scherer Supp. Decl. ¶ 4 & Ex.

B.)  *See also Boniel v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 458298, at *3 (E.D.N.Y. Feb.

6, 2013) ("[N]one of [the] documents are admissible because they are not accompanied by any

statement authenticating them or an affidavit or declaration attesting to their source and

provenance."), *reconsideration denied*, 2013 WL 1687709 (E.D.N.Y. Apr. 18, 2013), *appeal*

*dismissed* (Oct. 28, 2013); *see also Osorio v. Mathews Prime Meats, Inc.*, — F. Supp. 3d. —,

2015 WL 1919457, at *6–7 (E.D.N.Y. Apr. 28, 2015) (declining to consider documents without

verification or authentication); *Orraca v. Augustine*, No. 10-CV-840, 2014 WL 4265917, at *4

(W.D.N.Y. Aug. 27, 2014) (declining to consider documents containing no authentication other

than a lawyer's representation that they are "true and accurate copies"); *Oyibo-Ebije v. NYC*

*HRA*, No. 10-CV-1748, 2013 WL 415608, at *4 (S.D.N.Y. Jan. 29, 2013) (declining to consider

evidence when the defendants "never explain[ed] how the evidence would be admissible nor

[did] they ma[ke] any showing of the documents' [authenticity]"); *New York ex rel. Spitzer v. St.*

*Francis Hosp.,* 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000) ("Where a party wishes to have a court

consider documents which are not yet part of the court's record, the documents must be attached

to and authenticated by an appropriate affidavit and the affiant must be a competent witness

through whom the documents could be received into evidence at trial.").  Moreover, Defendants

seek to rely on some of these documents for the truth of the matter asserted.  In particular,

Defendants rely on Scherer's résumé as evidence of his employment background, and they rely

on Exhibits E, F, and KK as evidence that the contact information listed for certain persons are

correct.  However, Defendants offer no reasons that could allow the Court to find that the documents fit into any exception to the hearsay rule.  Accordingly, Plaintiff's Motion to Strike the above documents is granted.[37]

Next, Plaintiff moves to strike Paragraphs 3 to 12, 14 to 18, 21 to 24, 26 to 31, 33 to 36, and 38 of Scherer's Declaration as irrelevant, containing hearsay, and contradicting Scherer's prior admissions.  The Court strikes Paragraph 14, which states that McMahon hired Scherer because of his "extensive knowledge of the electric utility system and my several years of sales and marketing experience with electric utilities while at Dufresne Henry" because declarations must be made on personal knowledge, and Scherer does not set out his personal knowledge for that assertion.  The other paragraphs of the Declaration are considered to the extent that they are relevant and are not contradicted by Scherer's deposition or hearing testimony, as discussed in further detail above in the fact section.

Finally, Plaintiff moves for the Rones Declaration to be stricken because it "does not comply with the requirements of 28 U.S.C. § 1746 in that it was not subscribed to as true under penalty of perjury," it "asserts legal opinions on issues that are exclusively within the purview of the Court to determine," and it "raises issues that are not relevant or material for purposes of Shamrock Power's Motion for Summary Judgment."  (Pl.'s Mem. in Supp. of Mot. To Strike 13.)  In his declaration, Rones declared, "I, Kenneth S. Rones, pursuant to the requirements of 28 U.S.C. Section 1746, declare that the following is true and correct to the best of my knowledge and information."  (Rones Decl. at unnumbered 1.)  The Court agrees with Plaintiff that this is insufficient.  Under 28 U.S.C. § 1746, a declaration must be subscribed as true under penalty of

---

[37] Thus, even though Scherer's résumé, Exhibit G, was authenticated as Defendants argue, it nonetheless is inadmissible hearsay.

perjury, and dated, in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on (date)."  The Second Circuit has held that "28 U.S.C. § 1746 requires that a certification of the truth of a matter be expressly made under penalty of perjury."  *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013).  Rones's declaration neither certifies the truth of the statements contained nor does so expressly under penalty of perjury, and thus does not comply with § 1746.  The declaration also contains no relevant factual assertions, but rather is littered with legal conclusions.  (*See* Rones Decl. ¶ 2 (declaring that the evidence submitted by Defendants "raise[s] substantial issues of fact which warrant a denial of Plaintiffs motion"); *id.* ¶ 3 (declaring that "it is respectfully suggested that Andrew McMahon[] [should be required to submit a] current and more comprehensive Declaration"); *id.* ¶¶ 4–5 (declaring that the caption of the McMahon Declaration and Smith Declaration omit the names of Tilearcio and Storm King); *id.* ¶ 6 (declaring that Plaintiff's contact and customer information are not trade secrets).)  Because the Rones Declaration does not comply with § 1746 and contains mostly legal conclusions or irrelevant factual assertions, Plaintiff's Motion to Strike this Declaration is granted.

For the above reasons, the Court grants Plaintiff's Motion to Strike the Rones Declaration, the above-listed exhibits to the Scherer Declaration, and Paragraph 14 of Scherer's Declaration. However, the Court notes that, as discussed in further detail in the background section, even were it to consider all of the evidence submitted by Defendants, there still would not be a material issue of fact that would warrant a change in the Court's decision on Plaintiff's Motion for Summary Judgment.

### B.  Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that [her] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is

properly supported by documents or other evidentiary materials, the party opposing summary

judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's

goal should be "'to isolate and dispose of factually unsupported claims.'"  *Geneva Pharm. Tech.*

*Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 323–24 (1986)).

C.  Analysis

1.  Breach of Fiduciary Duty

Plaintiff claims that Scherer breached his fiduciary duty to it (Count III).  (Second Am.

Compl. ¶¶ 90–93.)  Under New York law, "[t]he elements of a claim for breach of a fiduciary

obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii)

damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir.

2011).  Under New York law, "[a] fiduciary relationship exists between two persons when one of

them is under a duty to act for or to give advice for the benefit of another upon matters within the

scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)

(internal quotation marks omitted).  "[I]t is not mandatory that a fiduciary relationship be

formalized in writing and the ongoing conduct between the parties may give rise to a fiduciary

relationship that will be recognized by the courts." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00-CV-8688, 2002 WL 362794, at *9 (S.D.N.Y. Mar. 6, 2002) (internal quotation marks omitted).  "[T]he existence of a fiduciary duty cannot be determined by recourse to rigid formulas and often is a factual question.  It arises . . . when a party reposes trust or confidence in another who thereby gains a resulting superiority or influence over the first," or "when a party exercises *de facto* control over or assumes responsibility for the affairs of another." *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 475 (S.D.N.Y. 2010) (footnotes, brackets, and internal quotation marks omitted), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011).  "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (brackets and internal quotation marks omitted).

Because Scherer was its employee, he had a fiduciary duty to Shamrock as a matter of law.  *See Nielsen Co. (US), LLC v. Success Sys., Inc.*, No. 11-CV-2939, 2013 WL 1197857, at *9 (S.D.N.Y. Mar. 19, 2013) ("As a matter of law, an employee owes a fiduciary duty to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost faith and loyalty in the performance of his duties." (alteration and internal quotation marks omitted)); *Geo Grp., Inc. v. Cmty. First Servs., Inc.*, No. 11-CV-1711, 2012 WL 1077846, at *8 (E.D.N.Y. Mar. 30, 2012) ("An officer[] and employee generally owes his employer a fiduciary duty of loyalty and good faith."); *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11-CV-4789, 2012 WL 383945, at *8 (S.D.N.Y. Feb. 1, 2012) ("Under New York law, an employee owes a fiduciary duty to his employer."); *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479, 485 (E.D.N.Y. 2008) ("New York law establishes that an employee-employer relationship is fiduciary." (internal quotation marks omitted)); *Benoit v. Commercial*

*Capital Corp.*, No. 03-CV-5328, 2008 WL 3911007, at *9 (S.D.N.Y. Aug. 25, 2008) ("[I]t is well settled in New York that an employee owes a fiduciary duty to an employer in the performance of the employee's duties.").  The existence of this fiduciary duty means that "an employee owes a duty of good faith and loyalty to his employer." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006); *see also Dauphin v. Crownbrook ACC LLC*, No. 12-CV-2100, 2014 WL 2002822, at *10 (E.D.N.Y. May 15, 2014) (internal quotation marks omitted) ("Under New York law, an employee owes a duty of good faith and loyalty to his employer."); *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) ("Employees owe duties of good faith and loyalty to their employers while carrying out their duties."); *W. Elec. Co. v. Brenner*, 360 N.E.2d 1091, 1094 (N.Y. 1977) (noting that "[t]he employer-employee relationship is one of contract, express or implied and, in considering the obligations of one to the other, the relevant law is that of master-servant and principal-agent" and that "[f]undamental to that relationship is the proposition that an employee is to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty" in performing his duties. (citations and internal quotation marks omitted)); *30 FPS Prods., Inc. v. Livolsi*, 891 N.Y.S.2d 162, 164 (App. Div. 2009) ("It is well settled that an employee owes a duty of good faith and loyalty to an employer in the performance of the employee's duties." (internal quotation marks omitted)).  This duty "may continue after termination of the employment relationship." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 914 (2d Cir. 1998).

It is undisputed that, while employed at Shamrock, and unbeknownst to Shamrock, Scherer and Tilearcio formed Scherer Utility.  (Pl.'s 56.1 ¶ 41; PI Tr. 115–17; Smith Decl. Ex. D (Articles of Organization).)  Additionally, while at Shamrock, Scherer represented manufacturer

PTI in a transaction that ultimately resulted in $271,806 in sales to Shamrock's customer, Con Edison, on behalf of PTI.  (Pl.'s 56.1 ¶ 44; *see also* Smith Decl. Ex. N (Accounts Receivable); Scherer Dep. 91–92; Scherer Decl. ¶¶ 20–21.)  Furthermore, the undisputed evidence shows that Scherer did not disclose the October 2011 transactions with PTI to Shamrock.  (Pl.'s 56.1 ¶ 45; Defs.' 56.1 ¶ 45.)  Instead, Scherer "specifically instructed both PTI and Con Edison to delete Shamrock Power's name from the purchase orders, and in several follow up emails reiterated that request and cautioned Con Edison . . . 'please do not send [purchase orders] to Shamrock.'" (Pl.'s 56.1 ¶ 45 (second alteration in original); *see also* Defs.' 56.1 ¶ 45; Smith Decl. Ex. O (PTI Transaction Emails).)

The undisputed evidence also shows that while employed by Shamrock and at an industry trade show that Shamrock paid for him to attend, "Scherer approached manufacturers regarding having Scherer Utility Sales, not Shamrock Power, serv[e] as their representative, and provided his contact information to those manufacturers."  (Pl.'s 56.1 ¶ 47; *see also* Defs.' 56.1 ¶ 47.)  "At least one manufacturer followed up on Scherer's proposal via email on February 17, 2012," noting that Scherer had expressed interest in representing Custom Utility and telling Scherer to contact him if he was still interested.  (Pl.'s 56.1 ¶ 48; Defs.' 56.1 ¶ 48.)

Additionally, the undisputed evidence shows that Scherer would not have been able to secure agreements with clients and manufacturers as quickly as he did after leaving Shamrock had he not started soliciting business before he left.  (Pl.'s 56.1 ¶¶ 75–76; PI Tr. 46–49; *see also* Smith Decl. Ex. S; Smith Reply Decl. Exs. BB, DD.)  The undisputed evidence further shows that Scherer took various proprietary data and documents from Shamrock, making copies of the data on his company-issued laptop and phone, which included price lists for Shamrock's clients. (*See* Pl.'s 56.1 ¶ 66; PI Tr. 90–91.)  Scherer also retained, and withheld from Shamrock Power,

confidential and proprietary client and customer emails, communications, and other sensitive

information belonging to Shamrock.  (Pl.'s 56.1 ¶ 65; Defs.' 56.1 ¶ 65.)

All of the above undisputed facts demonstrate that Scherer violated his fiduciary duty of

loyalty to Shamrock.  A court in this district has summarized the relevant law as follows:

> When an employee uses an employer's proprietary or confidential information
> when establishing a competing business, the employee breaches his or her fiduciary
> duty to the employer. . . . Although an employee may, of course, make preparations
> to compete with his employer while still working for the employer, he or she may
> not do so at the employer's expense, and may not use the employer's resources,
> time, facilities, or confidential information; specifically, whether or not the
> employee has signed an agreement not-to-compete, the employee, while still
> employed by the employer, may not solicit clients of his employer, may not copy
> his employer's business records for his own use, may not charge expenses to his
> employer, which were incurred while acting on behalf of his own interest, and may
> not actively divert the employer's business for his own personal benefit or the
> benefit of others.  In addition, even in the absence of trade secret protection,
> employees are not permitted to copy their employer's client list, and such acts have
> been deemed to be an egregious breach of trust and confidence.

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521–22

(S.D.N.Y. 2011) (internal citations and quotation marks omitted); *see also Fairfield Fin. Mortg.*

*Grp., Inc. v. Luca*, No. 06-CV-5962, 2014 WL 4638950, at *13 (E.D.N.Y. Sept. 16, 2014) ("A

breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits

an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of

confidential information, solicitation of employer's customers before cessation of

employment, . . . or usurpation of the employer's business opportunity." (internal quotation

marks omitted)); *Poller*, 974 F. Supp. 2d at 227 ("[W]hile mere advisement to one's clients of a

future planned departure from one's employment would not constitute a breach of loyalty or

fiduciary duties, the solicitation of those clients while still employed would constitute such a

breach."); *Am. Fed. Grp., Ltd. v. Rothenberg*, No. 91-CV-7860, 2003 WL 22349673, at *10

(S.D.N.Y. Oct. 14, 2003) ("[W]hen an employee . . . solicits the customers of a current employer

and diverts the current employer's business to himself, he breaches his fiduciary duty to his employer.").

Finally, Plaintiff has been damaged through this breach of fiduciary duty, in the very least through the diversion of the PTI sales from Shamrock to Scherer Utility while Scherer was still employed by Shamrock.  (*See* Pl.'s 56.1 ¶ 44; Smith Decl. Ex. N (Accounts Receivable), at unnumbered 1.)  Therefore, the undisputed evidence shows that Plaintiff is entitled to summary judgment on its breach of fiduciary duty claim.  The Court will hold an inquest on the appropriate quantum of damages owed to Plaintiff.  *See, e.g.*, *GM Produce Sales LCC v. Sam Jin World Trading Inc.*, No. 12-CV-4192, 2013 WL 6116847, at *4 (E.D.N.Y. Nov. 20, 2013) (granting summary judgment to the plaintiff and referring the case to a magistrate judge for a damages inquest); *Cuzco v. Orion Builders, Inc.*, No. 06-CV-2789, 2010 WL 2143662, at *1 (S.D.N.Y. May 26, 2010) (same).

### 2.  Faithless Servant

Plaintiff also brings a faithless servant claim against Scherer (Count XI).  (Second Am. Compl. ¶¶ 136–41.)  "The faithless servant doctrine is an alternative to a claim for breach of fiduciary duty . . . ."  *Webb v. RLR Assocs., Ltd.*, No. 03-CV-4275, 2004 WL 555699, at *2 (S.D.N.Y. Mar. 19, 2004).  "Under New York law, an agent is obligated 'to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'"  *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (some internal quotation marks omitted) (quoting *W. Elec. Co.*, 360 N.E.2d at 1094).  "One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary."  *Id.* (quoting *Feiger v.*

*Iral Jewelry, Ltd.,* 363 N.E.2d 350, 351 (N.Y. 1977)).  "It does not 'make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent.'"  *Id.* (quoting *Feiger*, 363 N.E.2d at 351).

"New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture."  *Phansalkar*, 344 F.3d at 201.  "New York courts have not reconciled any differences between them, or defined the circumstances, if any, in which one standard should apply rather than the other."  *Id.* at 202; *see also Stanley v. Skowron*, 989 F. Supp. 2d 356, 359–60 (S.D.N.Y. 2013) (same).  Here, however, the undisputed evidence shows that forfeiture is warranted under either standard, so the Court need not decide which standard should apply.  Under one standard, any misconduct that rises to the level of a breach of the duty of loyalty or good faith is sufficient to warrant forfeiture.  *See Phansalkar*, 344 F.3d at 202; *see also Gluco Perfect, LLC v. Perfect Gluco Prods., Inc.*, No. 14-CV-1678, 2014 WL 4966102, at *22 (E.D.N.Y. Oct. 3, 2014) (describing this standard as requiring forfeiture "where an agent acts adversely to his employer in any part of a transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of his employment" (alterations and internal quotation marks omitted)); *Stanley*, 989 F. Supp. 2d at 359–60 ("[This] standard requires only misconduct that rises to the level of a breach of a duty of loyalty or good faith.  In other words, it is sufficient that the employee acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." (alteration, footnote, and internal quotation marks omitted)); *Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 562 (S.D.N.Y. 2010) ("A faithless servant is one who owes a duty of fidelity to a principal and who is faithless in performance of

his services.").  As discussed above in the context of the breach of fiduciary duty claim, Scherer

breached his duty of loyalty to Shamrock under this test.

   The other standard requires forfeiture when "the 'misconduct and

unfaithfulness . . . substantially violates the contract of service.'"  *Phansalkar,* 344 F.3d at 201

(alteration in original) (quoting *Turner v. Konwenhoven*, 2 N.E. 637, 639 (N.Y. 1885)); *see also*

*Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 466 (S.D.N.Y. 2008) ("An employer

is entitled to recover compensation paid to a faithless servant upon a showing (1) that the

employee's disloyal activity was related to the performance of his duties, and (2) that the

disloyalty permeated the employee's service in its most material and substantial part." (internal

quotation marks omitted)); *In re Lehr Constr. Corp.*, 528 B.R. 598, 607 (Bankr. S.D.N.Y. 2015).

"Lower New York courts have . . . found agents' disloyalty to be 'substantial' in a variety of

circumstances.  They have found disloyalty not to be 'substantial' only where the disloyalty

consisted of a single act, or where the employer knew of and tolerated the behavior."

*Phansalkar*, 344 F.3d at 201–02 (footnote omitted); *see also Colliton v. Cravath, Swaine &*

*Moore LLP*, No. 08-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (same), *aff'd*,

356 F. App'x 535 (2d Cir. 2009).  Courts have found substantial disloyalty where, for example,

an employee stole at frequent intervals throughout his service, an employee persuaded other

employees to leave and tried to lure customers away, where an employee fraudulently removed a

contract and secretly appropriated the royalty checks under that contract, or that if an employee

established a competing company and actually competed against his employer.  *Phansalkar*, 344

F.3d at 201 n.12 (citing *Bon Temps Agency, Ltd. v. Greenfield,* 622 N.Y.S.2d 709, 710 (App.

Div. 1995); *Sundland v. Korfund Co.,* 20 N.Y.S.2d 819, 821–22 (App. Div. 1940); *Abramson v.*

*Dry Goods Refolding Co.*, 166 N.Y.S. 771, 773 (Sup. Ct. 1917); *Pictorial Films v. Salzburg,* 106

N.Y.S.2d 626, 629 (Sup. Ct. 1951)).  As discussed above, it is undisputed that, while employed

at Shamrock, and unbeknownst to Shamrock, Scherer formed Scherer Utility with Tilearcio on

September 28, 2011.  (Pl.'s 56.1 ¶ 41; PI Tr. 115–17; Smith Decl. Ex. D (Articles of

Organization).)  Additionally, while at Shamrock, Scherer represented manufacturer PTI in a

transaction that ultimately resulted in $271,806 in sales to Shamrock's customer, Con Edison, on

behalf of PTI.  (Pl.'s 56.1 ¶ 44; Smith Decl. Ex. N (Accounts Receivable); Scherer Dep. 91–92;

Scherer Decl. ¶¶ 20–21.)  Furthermore, the undisputed evidence shows that Scherer did not

disclose the October 2011 transactions with PTI to Shamrock.  (*See* Pl.'s 56.1 ¶ 45; Defs.' 56.1

¶ 45.)  Instead, as noted above, Scherer sought to hide this information from Shamrock.  (Pl.'s

56.1 ¶ 45; *see also* Defs.' 56.1 ¶ 45; Smith Decl. Ex. O (PTI Transaction Emails).)  The

undisputed evidence also includes Scherer's approach to manufacturers at an industry trade show

regarding having Scherer Utility Sales, not Shamrock Power, serve as their representative, and

provided his contact information to those manufacturers, (Pl.'s 56.1 ¶ 47; *see also* Defs.' 56.1

¶ 47), at least one of which followed up with Scherer, (Pl.'s 56.1 ¶ 48; Defs.' 56.1 ¶ 48).

Finally, the undisputed evidence shows that Scherer would not have been able to secure

agreements with clients and manufacturers as quickly as he did after leaving Shamrock had he

not started soliciting business before he left.  (Pl.'s 56.1 ¶¶ 75–76; PI Tr. 46–49; *see also* Smith

Decl. Ex. S; Smith Reply Decl. Exs. BB, DD.)  As noted, the undisputed evidence shows that

Scherer took various confidential and proprietary data and documents from Shamrock, making

copies of the data on his company-issued laptop and phone, which included price lists for

Shamrock's clients.  (*See* Pl.'s 56.1 ¶ 66; PI Tr. 90–91.)

This undisputed evidence is more than sufficient to show that the unfaithful conduct

substantially violates the contract of service.  The disloyalty was not an isolated incident, nor

was it done with Shamrock's knowledge.  Rather, Scherer was actively competing against

Shamrock while employed by it and stole confidential and proprietary information from

Shamrock, where Scherer was aware of the value of this confidential information to Shamrock.

*See Phansalkar*, 344 F.3d at 201–02 & n.12; *see also Stanley*, 989 F. Supp. 2d at 361–62

(holding that an employee's misconduct and unfaithfulness substantially violated the contract of

service where he only committed insider trading once, but then lied and covered up this fact over

several years and thus his disloyalty "occurred repeatedly, lasted for many months, persisted

boldly through an opportunity to correct them, and occurred in his primary areas of

responsibility" (internal quotation marks omitted)); *Design Strategies, Inc.*, 384 F. Supp. 2d at

663–64 (holding that an employee's misconduct and unfaithfulness substantially violated the

contract of service where the employee's wrongdoing was related to a single business

opportunity, but involved conduct over a longer period of time including several discussions and

calls likely spanning two months, where the employee never informed the employer of his

actions, and the disloyalty was substantial in that it involved an important client and a potentially

very lucrative contract).  Thus, under either standard, Shamrock is entitled to summary judgment

on its faithless agent claim.

"A faithless servant forfeits all compensation earned during the period of his disloyalty

even if his services benefited the principal in some part."  *Tyco Int'l*, 756 F. Supp. 2d at 562

(citing *Phansalkar*, 344 F.3d at 208); *see also Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03-

CIV-4275, 2003 WL 23018792, at *6 (S.D.N.Y. Dec. 23, 2003) ("A principal is entitled to

recover from his unfaithful agent any commission paid by the principal.  It is immaterial that the

services were beneficial to the principal, or that the principal suffered no provable damage as a

result of the breach of fidelity by the agent.  The doctrine ensures that a disloyal agent is not

compensated even when the princip[al] suffers no loss." (citations and internal quotation marks

omitted)), *aff'd*, 128 F. App'x 793 (2d Cir. 2005); *In re Food Mgmt. Grp., LLC*, 380 B.R. 677,

713 (Bankr. S.D.N.Y. 2008) (noting that, "[u]nder New York law, the so-called faithless servant

doctrine requires disgorgement of all compensation received after the date the disloyalty began"

even if the servant's services benefitted the principal).  "However, the Second Circuit has carved

out a limited exception where compensation is expressly allocated among discrete tasks, such as

commissions.  In such cases, the employee may keep compensation derived from any

transactions that were separate from and untainted by the disloyalty." *Stanley*, 989 F. Supp. 2d at

360.  For apportionment to be available, the following requirements must be met: (1) the parties

must have agreed that the agent will be paid on a task-by-task basis, for example a commission

on sales, (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the

"agent's disloyalty with respect to other tasks 'neither tainted nor interfered with the completion

of' the tasks as to which the agent was loyal." *Phansalkar*, 344 F.3d at 205 (quoting *Musico v.*

*Champion Credit Corp.*, 764 F.2d 102, 113 (2d Cir. 1985)); *see also Stanley*, 989 F. Supp. 2d at

360 (same).

      Here, Scherer received a salary, for which apportionment is not available, as well as

commissions, for which apportionment could potentially be available.  However, while the

commission/bonus payments represent payment on a task-by-task basis, Defendants have offered

no basis for the Court can apportion damages.  *See Stanley*, 989 F. Supp. 2d at 363 ("[The

employee] is only entitled to retain some portion of his compensation if he was paid on a 'task-

by-task' basis and can demonstrate that certain transactions were wholly untainted by his

disloyalty."); *GRG Grp., Inc. v. Ravenal*, 668 N.Y.S.2d 352, 352 (App. Div. 1998) (affirming a

decision requiring an employee to pay back fees and commissions earned during several years of

employment "where the evidence demonstrated disloyalty during those years and there is no basis in the record for apportionment"). Therefore, the Court concludes that Plaintiff is entitled to restitution of some or all of Scherer's salary for the period of employment during his disloyalty. The exact amount of compensation to Plaintiff will be determined at an inquest hearing, and the Parties may put forth evidence at that hearing about whether apportionment is warranted.

### 3. Misappropriation of Trade Secrets

In its Fifth Count, Plaintiff claims that Defendants have misappropriated Plaintiff's trade secrets (Count V). (Second Am. Compl. ¶¶ 100–10.) When "set[ting] forth a claim for misappropriation of trade secrets, a plaintiff must demonstrate (1) that it possessed a trade secret; and (2) that the defendant used that trade secret in breach of an agreement, confidence, or duty, or as the result of discovery of the secret by improper means." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 349 (S.D.N.Y. 2009). "[A] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (alterations in original) (internal quotation marks omitted) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,* 118 F.3d 955, 968 (2d Cir. 1997)). In determining whether information constitutes a trade secret, New York courts have considered the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007,

1013 (N.Y. 1993)).  "Although New York courts have identified a number of factors that courts

may look to in determining whether information constitutes a trade secret, the most important

consideration is whether the information was kept secret."  *Geritrex Corp. v. Dermarite Indus.,*

*LLC*, 910 F. Supp. 955, 961 (S.D.N.Y. 1996) (citation omitted).

 Plaintiff argues that Scherer was given several types of information that constituted trade

secrets, including Shamrock's industry contacts, client contacts, pricing lists, commission

schedules, contracts, and order history.  Defendants do not dispute that anything other than the

contact information is confidential.  (*See, e.g.*, Defs.' 56.1 ¶ 27 (responding to an assertion that

Shamrock provided him with access to "confidential, proprietary and trade secret information

regarding Shamrock Power's industry contacts; its Client contacts, pricing lists, and commission

schedules; and its actual and potential Customer Contacts, contracts and order histories" by

stating that there did not exist a "confidential customer list"); *id.* ¶ 68 (responding to an assertion

that the information that had been deleted and retained by Defendants—including not only client

contact information, but also price lists, account information, and customer communications—

was not publicly available by stating that "Scherer disputes that the contacts, whether at a

utility[] or at a manufacturer[,] are not publicly available," and that McMahon did not tell him

not to give out customer contact information).)  However, Defendants dispute that the client

contact information is a trade secret.

 Here, the undisputed evidence shows that in Shamrock's industry, for security purposes,

the identities, location, and contact information for the purchasing engineers at its customers'

and potential customers' sites are not widely known and therefore, an individual seeking to sell

high voltage power equipment cannot simply make a cold call to the purchasing engineers.  (Pl.'s

56.1 ¶ 15; *see also* PI Tr. 54–56.)  In particular, Plaintiff contends that the identities and

locations of Shamrock's engineering contacts at customers such as Con Edison, Central Hudson

Gas & Electric, Orange and Rockland, and others were confidential trade secrets and not publicly

disseminated.  (Pl.'s 56.1 ¶ 67; *see also* PI Tr. 69–70.)   The undisputed evidence also shows that

Plaintiff has "devoted significant time, effort, and money to establishing relationships with its

Customer Contacts over a number of years, and to maintaining the confidentiality of the contact

information for its Customer Contacts and the purchasing needs and preferences of its

Customers."  (Pl.'s 56.1 ¶ 16; *see also* PI Tr. 40, 48–49, 53–54, 55, 58, 61–63, 85.)  Indeed,

Shamrock takes "reasonable measures to protect that information from dissemination," including

keeping the information in a locked building and on a password-protected computer system, and

sharing it with sales representatives only on a need-to-know basis.  (Pl.'s 56.1 ¶ 17; *see also* PI

Tr. 109–10.)  Shamrock also has an employee handbook emphasizing the need to keep this

information confidential.  (Pl.'s 56.1 ¶ 18; PI Tr. 67–70; Smith Decl. Ex. J (Handbook), at 1, 4,

10, 13, 20.)  Moreover, Andrew McMahon frequently reminded his employees of the need to

maintain the confidentiality of client and customer information.  (Pl.'s 56.1 ¶ 19; PI Tr. 61.)  The

undisputed evidence also shows that the materials retained by Scherer had independent economic

value for Shamrock because it was not publicly available, and without maintaining control of its

customer information, the manufacturers or someone else could use that information to steal the

business.  (Pl.'s 56.1 ¶ 68; PI Tr. 69–70.)  For that reason, Shamrock employees were told not to

give their contacts' information out to anyone, including manufacturers.  (Pl.'s 56.1 ¶ 69; PI Tr.

61.)

　　　　"A customer list developed by a business through substantial effort and kept in

confidence may be treated as a trade secret and protected at the owner's instance against

disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Jinno Int'l Co. v. Premier Fabrics, Inc.*, No. 12-CV-7820, 2013 WL 4780049, at *5 (S.D.N.Y. May 24, 2013) (internal quotation marks omitted); *see also Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001) (same).  Here, the undisputed evidence warrants summary judgment in Plaintiff's favor.  The evidence shows that the contact information was not readily available, that it was shared with employees of Shamrock only on a need-to-know basis, and that the business took reasonable measures to protect the information. Shamrock, in fact, signed agreements with manufacturers requiring Shamrock to safeguard information.  The need to maintain the confidentiality of the contact information is central to Plaintiff's business model, as Shamrock essentially acts as a middle-man and if the contacts were widely known Shamrock could be cut out of the equation.  (*See* Pl.'s 56.1 ¶ 68; PI Tr. 69–70.)

Moreover, Scherer retained not only client contact information, but also confidential information about customer preferences and order histories, as well as pricing information about Shamrock's manufacturers.  (*See* Pl.'s 56.1 ¶¶ 65–66; Defs.' 56.1 ¶ 65; PI Tr. 89–91.)  The sum of this proprietary information, which Shamrock attempted to safeguard, constituted protectable trade secrets.  *See N. Atl. Instruments*, 188 F.3d at 46 ("Numerous cases applying New York law have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply.") (collecting cases); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 309 (N.D.N.Y. 2007) ("[The plaintiff] also seeks trade secret protection for information related to its operating practices and methods, including pricing and billing methods and marketing and selling practices; sales force support services; business opportunities; and the strengths and weaknesses of [the plaintiff's] products and services.  Courts have found that information of this

type may be considered confidential."); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278 (E.D.N.Y. 2002) ("[K]nowledge of a customer's needs and specifications and the prices charged to that customer are considered confidential."); *Nu-Chem Labs., Inc. v. Dynamic Labs., Inc.*, No. 96-CV-5886, 2001 WL 35981560, at *17 (E.D.N.Y. Mar. 30, 2001) ("Numerous New York courts have afforded trade secret protection to pricing information, purchasing preferences and individual contact information, because such information would be unusually difficult to duplicate."); *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1046 (S.D.N.Y. 1987) ("There is little doubt that information which [the defendant] learned while employed at [the plaintiff] concerning customer preferences and [the plaintiff's] pricing is protect[a]ble."); *id.* (finding a likelihood of success on the merits with regard to a claim that contact information was protectable where it could take several phone calls over a period of time and perhaps a meeting to identify the proper contact); *Gen. Elec. Co. v. Macejka*, 675 N.Y.S.2d 420, 420–21 (App. Div. 1998) (finding that pricing and profit margin information is a trade secret).

Furthermore, the undisputed evidence shows that Scherer copied information from his Shamrock-issued laptop and cell phone. The data and emails copied from the laptop included proprietary price lists for Shamrock's clients. (Pl.'s 56.1 ¶ 66; PI Tr. 90–91.) Scherer also retained, and withheld from Shamrock Power, client and customer emails, communications, and other data belonging to Shamrock. (Pl.'s 56.1 ¶ 65; Defs.' 56.1 ¶ 65.) It is well-established that "New York law imposes a duty not to use trade secrets in competition with a former employer." *N. Atl. Instruments*, 188 F.3d at 47. "This duty exists as well after the employment is terminated as during its continuance." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983) (internal quotation marks omitted); *see also N. Atl. Instruments*, 188 F.3d at 47–48 (same); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 579–80 (S.D.N.Y. 2009) (same). Here,

the evidence shows that Scherer did in fact use the protected information.  In particular, after resigning from Shamrock, Scherer responded to email correspondence and customer inquiries despite the fact that those communications were intended for Shamrock, not Defendants.  (Pl.'s 56.1 ¶ 65; Defs.' 56.1 ¶ 65.)  And, on October 8, 2012, the day that Scherer resigned, he sent emails from the jscherer15@msn.com email address to some Shamrock Power clients, using the confidential contact information he had obtained from Shamrock, informing them that "he had resigned from Shamrock Power but 'would like to continue [his] professional representation of [them] and [their] compan[ies] in the New York and New Jersey area via [his] new company.'" (Pl.'s 56.1 ¶ 74; Second Am. Compl. ¶ 44; Answer ¶ 2.)  Moreover, Scherer used Plaintiff's confidential pricing information for its manufacturers, by representing competitors and underbidding Shamrock's manufacturers to win contracts.  (Pl.'s 56.1 ¶ 92; McMahon Decl. ¶¶ 14–15.)  Thus, Shamrock is entitled to summary judgment on its misappropriation of trade secrets claim.

Plaintiff seeks a permanent injunction on this claim, arguing that Scherer should be permanently enjoined from (1) using Shamrock's trade secrets and (2) competing against Shamrock in the geographic area that was his territory as a Shamrock employee.  (*See* Notice of Pl. Shamrock Power Sales, LLC's Partial Mot. for Summ. J. (Dkt. No. 69).)  "Under Second Circuit precedent, a permanent injunction is warranted where the moving party establishes: (1) success on the merits; (2) the lack of an adequate remedy at law; and (3) irreparable harm if relief is not granted."  *SunTrust Banks, Inc. v. Turnberry Capital Mgmt. LP*, 945 F. Supp. 2d 415, 420 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 566 F. App'x 32 (2d Cir. 2014); *see also J.P. Morgan Sec. LLC v. Quinnipiac Univ.*, No. 14-CV-429, 2015 WL 2452406, at *3 (S.D.N.Y. May 22, 2015) (same).  Plaintiff urges the Court to hold that irreparable harm is

presumed in trade secret misappropriation cases, citing *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994), which held that "irreparability of the harm is presumed in cases of trade secret misappropriation." (*See* Pl.'s Mem. 27–28.) However, years later, in *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009), the Second Circuit drew a key distinction between instances where irreparable harm may and may not be presumed. The Second Circuit explained:

> We have previously observed that the loss of trade secrets cannot be measured in money damages where that secret, once lost, is lost forever. Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated. That reading is not correct. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

*Id.* at 118–19 (citations and internal quotation marks omitted); *see also Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 197 (E.D.N.Y. 2013) (applying *Faiveley* and holding that there was no presumption of irreparable harm); *Sasqua Grp., Inc. v. Courtney*, No. 10-CV-528, 2010 WL 3613855, at *11–12 (E.D.N.Y. Aug. 2, 2010) (same), *adopted by* 2010 WL 3702468 (E.D.N.Y. Sept. 7, 2010); *Passlogix, Inc. v. 2FA Tech., LLC*, No. 08-CV-10986, 2010 WL 2505628, at *8–9 (S.D.N.Y. June 21, 2010) (same). Plaintiff does not assert that Defendants are disseminating its trade secrets, (*see, e.g.*, Pl.'s 56.1 ¶¶ 74, 92, 99–100), but rather that they are *using* them and thus there is no presumption of irreparable harm. Plaintiff does not offer any other argument for why it has established irreparable harm. (*See generally* Pl.'s Mem. 26–28.) Indeed, a review of Plaintiff's Rule 56.1 statement supports a finding that monetary damages are

ascertainable, and therefore may be adequate, as Plaintiff set out in detail the damages it claims to have suffered as a result of Defendants' misappropriation of Plaintiff's trade secrets. (*See* Pl.'s 56.1 ¶¶ 101–10.)  The only fact set forth by Plaintiff that could conceivably support a finding inadequacy of monetary damages is that "Defendants have consistently maintained that they lack the financial resources to pay a significant judgment to Shamrock Power."  (Pl.'s 56.1 ¶ 111; Defs.' 56.1 ¶ 111.)  However, to the extent that being unable to recover a money judgment is sufficient to show irreparable harm, Plaintiff has provided no evidence showing it actually will not be able to recover damages, just that Defendants claim they will be unable to pay, and this is insufficient to establish a likelihood of irreparable harm.  *See Levy v. Young Adult Inst., Inc.*, No. 13-CV-2861, 2015 WL 170442, at *8 (S.D.N.Y. Jan. 13, 2015) (denying motion for preliminary injunction because the plaintiffs "offer[ed] no evidence that [the defendant] is or will be insolvent," but rather argued that the defendant "*may* lack sufficient assets to pay a judgment"); *Gladstone v. Waldron & Co.*, No. 98-CV-2038, 1998 WL 150982, at *2 (S.D.N.Y. Mar. 31, 1998) ("Courts routinely hold that conclusory assertions of defendants' financial weakness do not demonstrate a likelihood of irreparable harm.").  Thus, Plaintiff has failed to make the showing required to warrant imposition of a permanent injunction.  Therefore, this Motion is denied without prejudice to renewal with the support of additional evidence demonstrating irreparable harm.

### 4.  Fraud in the Inducement

Plaintiff also brings a claim of fraud in the inducement against Scherer (Count X).  (*See* Second Am. Compl. ¶¶ 130–35.)  As the Second Circuit has explained:

> The elements of fraud under New York law are: "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable

reliance of the other party on the misrepresentation or material omission, and [4] injury."

*Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (alteration in original) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)); *see also Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 309 (S.D.N.Y. 2014) (same); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 623 (S.D.N.Y. 2009) (same). "Each element must be proven at all stages, including at summary judgment, by clear and convincing evidence." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 561 (E.D.N.Y. 2010).

Plaintiff claims that Scherer committed fraud in representing that he needed the bonus advance in order to buy his wife a car.  (*See* Pl.'s Mem. 32–33.)  According to Plaintiff's evidence, in late September 2012, Scherer requested a $20,000 advance from Shamrock Power, and "Scherer informed Shamrock Power that he needed the advance so that he could buy his wife a car as [a] 25th wedding anniversary gift."  (Verified Compl. ¶ 19; *see also* Pl.'s 56.1 ¶ 54; Scherer Dep. 69.)  Shamrock gave Scherer a check for $19,528.42, which was deposited into Scherer's account at First Niagara Bank and cleared Shamrock's bank account on October 7, 2012.  (Pl.'s 56.1 ¶ 56; Defs.' 56.1 ¶ 56.)  "On October 8, 2012, the day after he received the advance, Scherer abruptly resigned from Shamrock Power by calling and leaving a voice mail message for the company's President, Andrew McMahon."  (Pl.'s 56.1 ¶ 57; *see also* Defs.' 56.1 ¶ 57.)

Scherer disputes that he told McMahon he needed the advance to buy his wife a car. (Defs.' 56.1 ¶ 54.)  Scherer claims in his Declaration that the $19,528.43 represented commission money due from 2011.  (Scherer Decl. ¶ 17.)  However, this assertion cannot create a material issue of fact because, before writing the Declaration, Scherer had previously testified

at his deposition that the money was an *advance*.  (*See* Scherer Dep. 69 ("Q:  So was this the advance that Shamrock Power gave you?  A:  Yes.").)  *See also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *Lewin v. Richard Avedon Found.*, No. 11-CV-8767, 2015 WL 3948824, at *3 n.1 (S.D.N.Y. June 26, 2015) (same); *Clark v. Jewish Childcare Ass'n, Inc.*, — F. Supp. 3d —, 2015 WL 1452134, at *9 (S.D.N.Y. Mar. 31, 2015) (same); *Mulero v. City of Bridgeport*, No. 07-CV-1206, 2010 WL 2585040, at *4 (D. Conn. June 22, 2010) (same), *aff'd sub nom. Mulero v. City of Bridgeport Bd. of Educ.*, 448 F. App'x 129 (2d Cir. 2011); *cf. In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014) (explaining that "as a general matter, . . . plaintiffs may not create material issues of fact by submitting affidavits that dispute their own prior testimony").  Nothing else in Scherer's Declaration provides any other evidence to dispute that Scherer said he needed the money to buy his wife a car.  (*See generally* Scherer Decl.)  The other evidence Defendants cite in support of this contention in their Rule 56.1 statement are exhibits that, according to defense counsel, show emails sent from Scherer to McMahon on September 18 and 19, 2012 requesting to go over 2011/2012 commission issues and show Scherer's calculation of back-owed commissions.  (*See* Defs.' 56.1 ¶ 54 (citing Scherer Exs. KK, LL).)  However, Scherer Exhibit KK, which defense counsel represents contains the above-mentioned emails, does not, nor does Exhibit KK to Defendants' Rule 56.1 statement.  (*See* Scherer Decl. Ex. KK; Defs.' 56.1 Ex. KK.)  Indeed, after reviewing the entire record, the Court did not find a single email from Scherer dated September 18 or 19, 2012.  And Scherer Exhibit LL, which counsel represents is a word document showing Scherer's calculation of back-owed commission, does not exist.

Exhibit LL to Defendants' Rule 56.1 statement also does not contain such a calculation.  (*See*

Defs.' 56.1 Ex. LL.)  Furthermore, even if this evidence did exist, it would not be inconsistent

with Plaintiff's evidence that Scherer represented that he needed the advance to buy his wife a

car.  Therefore, the undisputed evidence shows that Scherer did make this representation, and

that Plaintiff gave Scherer a check for $19,528.43, and that, the day after the check cleared

Plaintiff's bank account, Scherer abruptly resigned and then used that money to support himself

and his new business.  Plaintiff's evidence, unrefuted by Defendants, is sufficient to establish

that Scherer made a materially false statement on which Plaintiff relied.  Therefore, Plaintiff's

Motion for Summary Judgment is granted.

### 5.  Unjust Enrichment

Plaintiff brings a claim of unjust enrichment against all Defendants (Count XIV), (*see*

Second Am. Compl. ¶¶ 156–58), and moves for summary judgment on this claim against Scherer

with respect to the $19,528.42 advance, (Pl.'s Mem. 31–32).[38]  "In order to prevail on a claim of

unjust enrichment under New York law, plaintiff must demonstrate 1) defendant was enriched;

2) defendant's enrichment came at plaintiff's expense; and 3) 'circumstances were such that in

equity and good conscience [defendant] should compensate [plaintiff].'"  *Colliton*, 2008 WL

4386764, at *7 (alterations in original) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d

Cir. 1997)), *aff'd*, 356 F. App'x 535 (2d Cir. 2009); *see also Georgia Malone & Co. v. Rieder*,

973 N.E.2d 743, 746 (N.Y. 2012) ("The theory of unjust enrichment lies as a quasi-contract

claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an

actual agreement between the parties.  An unjust enrichment claim is rooted in the equitable

---

[38] Although this Count is brought against all Defendants, (see Second Am. Compl.
¶¶ 156–58), Plaintiff makes no argument as to why it is entitled to summary judgment against the
Defendants other than Scherer, (Pl.'s Mem. 31–32).

principle that a person shall not be allowed to enrich himself unjustly at the expense of another."

(alteration, citations, and internal quotation marks omitted)).  "Further, although privity is not

required for an unjust enrichment claim, a claim will not be supported unless there is a

connection or relationship between the parties that could have caused reliance or inducement on

the plaintiff's part." *Georgia Malone & Co. v. Rieder*, 926 N.Y.S.2d 494, 497 (App. Div. 2011),

*aff'd*, 973 N.E.2d 743 (2012); *see also Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y.

2007) (acknowledging that "a plaintiff need not be in privity with the defendant to state a claim

for unjust enrichment" but finding connection between parties nonetheless "too attenuated" to

support claim).

  Here, as discussed above, the evidence is that Scherer was given an advance.  Plaintiff

asserts that this was an advance on his commission/bonus payment, (*see* Pl.'s 56.1 ¶ 54 (citing

Verified Compl. ¶ 19)), and asserts that, under Shamrock practice, Scherer would not have

earned the bonus until the end of December.  In particular, Plaintiff offers evidence that on

March 2, 2012, Andrew McMahon informed Scherer that bonuses "will be paid to employees

who are currently employed as [of] December 31 of the payroll year."  (*See* Smith Decl. Ex. K

(Salary Email).)  Additionally, Scherer's salary history reflects the fact that bonuses were paid in

December, except for occasional advances and except for the 2009 commission check which was

initially paid on December 31, 2009 and was later supplemented on March 8, 2010 and again on

August 27, 2010, and the 2007 commission check which was initially paid on December 31,

2007 and then supplemented on May 19, 2008.  (*See* Smith Reply Decl. Ex. CC (Scherer Salary

History); Defs.' 56.1 ¶ 31 (citing Scherer Decl. Ex. N (Pay Stubs from May 19, 2008 and March

8, 2010).)  Moreover, Scherer admitted that the bonuses were paid around December, as he

stated in his Declaration that "he originally planned to leave Shamrock Power 'in January 2012

64

after [he] received [his] end of the year commission.'"  (Pl.'s Reply 56.1 ¶ 31 (quoting Scherer

Decl. ¶ 19).)  Indeed, even in opposing Plaintiff's Rule 56.1 statement, Defendants state that the

bonuses were due on December 31.  (Defs.' 56.1 ¶ 31 (stating that bonuses due on December 31,

2007 and December 31, 2009 were not paid in full on those dates).)

 The Court notes that there is some evidence that this payment was a payroll advance

rather than an advance against commissions.  Shamrock's records of Scherer's salary history

state that this paycheck was a "2012 Payroll Advance," while some other advances have the

notation "Advance on Commission 2011" or "Advance of Commission for 2008."  (*See* Smith

Reply Decl. Ex. CC at 2–3.)  However, this dispute is immaterial, as the undisputed evidence

shows that, whether the payment was an advance on the December bonus or a salary advance, at

the time Scherer left Shamrock, he had not yet earned the money.  This evidence, when

combined with the evidence above that Scherer induced Shamrock to pay him the advance and

then, as soon as the check cleared, quit and used the money to support his company that

competed against Shamrock, is sufficient to warrant summary judgment on this unjust

enrichment claim against Scherer.  It would be against equity and good conscience to allow

Scherer to keep an advance on money he had not yet earned that he obtained through Plaintiff's

reliance on his false pretenses.  Therefore, Plaintiff's Motion for Summary Judgment on this

claim is granted.

### III.  Conclusion

 For the foregoing reasons, Plaintiff's Motion to Strike the Rones Declaration, Paragraph

14 of the Scherer Declaration, and Exhibits D, E, F, G, L, M, N, P, R, T, U, X, DD, II, JJ, KK,

NN, OO, and TT to Scherer's Declaration is granted.  Furthermore, Plaintiff's Motion for Partial

Summary Judgment is granted.  Finally, Plaintiff's Motion for a Permanent Injunction is denied

without prejudice.  The Clerk of the Court is respectfully requested to terminate the pending

Motions.  (Dkt. Nos. 69, 82.)

SO ORDERED.

Dated:      September 30, 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE