UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SHAMROCK POWER SALES, LLC,

                              Plaintiff,                    **REPORT AND**
                                                           **RECOMMENDATION**

          -against-
                                                           12 Civ. 8959 (KMK)(JCM)
JOHN SCHERER, PATRICE TILEARCIO,
SCHERER UTILITY SALES, LLC,
and STORM KING POWER SALES, LLC,

                              Defendants.
------------------------------------------------------------X

To the Honorable Kenneth M. Karas, United States District Judge:

Plaintiff Shamrock Power Sales, Inc. ("Plaintiff" or "Shamrock Power") seeks to recover

damages from defendants John Scherer ("Defendant Scherer"), Patrice Tilearcio ("Defendant

Tilearcio"), Scherer Utility Sales, LLC, and Storm King Power Sales, LLC (collectively

"Defendants") for causes of action arising out of Defendant Scherer's employment with Plaintiff.

(Docket No. 1).  Plaintiff filed the instant complaint on December 10, 2012, alleging fourteen

causes of action. (*Id.*).  On September 30, 2015, the Honorable Kenneth M. Karas ("Judge

Karas") entered summary judgment on five of Plaintiff's claims: breach of fiduciary duty;

faithless servant; misappropriation of trade secrets; fraud in the inducement; and unjust

enrichment. *See Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959(KMK), 2015 WL

5730339 (S.D.N.Y. Sept. 30, 2015).  Following entry of summary judgment, this matter was

referred to the undersigned to oversee damages discovery and conduct an inquest on damages.

(Docket No. 148).  The undersigned oversaw limited discovery on damages, with the final

discovery deadline of April 1, 2016.[1]  The undersigned then conducted an inquest hearing on

damages on June 30, 2016.  Plaintiff's president, Andrew McMahon ("Mr. McMahon"), and

Defendant Scherer testified at the hearing.  Based on the evidence presented at that hearing, as

well as the admissible evidence submitted to the Court in support of Plaintiff's motion for

assessment of damages, I respectfully recommend entry of a judgment awarding Plaintiff

$493,866.04 in damages and prejudgment interest at 9% per annum from January 5, 2015 to the

date judgment is entered.  Additionally, I respectfully recommend that the Court deny (1)

Plaintiff's motion to strike certain portions of the declarations annexed to Defendants' opposition

papers (the "Motion to Strike"[2]); and (2) the requests set forth in Defendants' July 13, 2016 letter

to strike and disregard portions of Plaintiff's submissions, (Docket No. 142).

## I. BACKGROUND[3]

Plaintiff is a seller of "high voltage power equipment" that serves as the exclusive

representative for manufacturers of these products in sales deals with utility companies such as

Con Edison, Long Island Power Authority, Orange and Rockland Utility, Central Hudson Gas

and Electric, National Grid, Public Service Gas and Electric, New York Power Authority, Long

Island Railroad, New Jersey Transit, Metro North Railroad, Wesco and Graybar. (Summary

---

[1] On April 29, 2016, Plaintiff moved for a preliminary injunction to freeze Defendants' assets. (Docket No. 113). The undersigned submitted a Report and Recommendation on the motion for a preliminary injunction on June 15, 2016. (Docket No. 136).

[2] Refers to Plaintiff's Memorandum of Law in Support of its Motion to Strike. (Docket No. 135).

[3] Many of the facts of the dispute between the parties are detailed in Judge Karas' September 30, 2015 Opinion and Order granting summary judgment on five of Plaintiff's claims ("Summary Judgment Order"). (Docket No. 97). *Shamrock Power Sales, LLC*, 2015 WL 5730339, at *1.  The Court has also based the following recitation of facts on Plaintiff and Defendants' submissions on this inquest, (Docket Nos. 115-119, 128-133), and the testimony of Mr. McMahon and Defendant Scherer at the inquest hearing on June 30, 2016.  At the inquest hearing, Mr. McMahon indicated that testimony given at the Show Cause Hearing for a preliminary injunction was also relevant to the issue of damages. Accordingly, the Court has reviewed the transcript of the Show Cause Hearing dated December 21, 2012, and the exhibits from that proceeding.

Judgment Order[4] at 3-4). Plaintiff represents approximately forty manufacturers in distinct geographic regions from New Jersey to Maine. (Inquest Hr'g. Tr.[5] at 7). Plaintiff enters into contracts with manufacturers by which any sales made of the manufacturers' products within the contracted region results in a commission paid to Plaintiff. (*Id.*). These contracts vary in duration, from a thirty-day contract to a year-long contract that renews automatically at the end of the year unless either party declines to continue the relationship. (*Id.*). Plaintiff does not have a contract with every manufacturer that it represents. (OSC Hr'g. Tr.[6] at 100). Mr. McMahon testified that manufacturers and Plaintiff generally have a thirty-day notice period to terminate the relationships, but that it was not common for a manufacturer to do so. (*Id.* at 104, 109).

In 2004, Plaintiff hired Defendant Scherer as a sales representative, providing him with confidential information regarding the industry, client and customer contacts, pricing lists, commission schedules, contracts and pricing histories to allow him to sell high voltage power equipment -- made by Plaintiff's manufacturer clients -- to Plaintiff's utility company customers. (Summary Judgment Order at 4, 6). Defendant Scherer mainly worked in the New York City, New Jersey and Long Island areas, although he also worked in Dutchess County, (Inquest Hr'g. Tr. at 116), and Mr. McMahon testified that, for a period of time, Defendant Scherer also covered for another sales representative in upstate New York, (*id.* at 27). During his employment with Plaintiff, Defendant Scherer's customers included Central Hudson Gas and Electric, Con Edison, National Grid, Orange and Rockland Utilities, and Public Service Electric and Gas. (Inquest Hr'g. Tr. at 116; Summary Judgment Order at 5). In addition to forming relationships with contacts at these utility company customers, Defendant Scherer attended trade

---

[4] Refers to Judge Karas' September 30, 2015 Opinion and Order. (Docket No. 97).

[5] Refers to the transcript of the Damages Inquest Hearing, held on June 30, 2016.

[6] Refers to the transcript of the Order to Show Cause Hearing, held before Judge Karas on December 21, 2012.

shows on behalf of Plaintiff to call on potential customers in the market. (Inquest Hr'g. Tr. at 116).

Both Plaintiff and Defendant Scherer assert that Defendant Scherer was paid a base salary of $65,000 per annum. (Inquest Hr'g. Tr. at 129; OSC Hr'g. Tr. at 64). Additionally, Defendant Scherer earned a percentage of the commissions that he brought in for Plaintiff, portions of which were paid to him as bonus advances throughout the year. (Inquest Hr'g. Tr. at 77-78). For example, according to the records supplied by Defendant Scherer, in 2011 he received $65,000 in salary, two bonus advances of $35,000, IRA contributions of $1,200, medical expenses of $16,267.92 and a final bonus payment of $53,484.59.[7] (Scherer Decl.[8] at Ex. B). A review of the pay records provided by Defendant Scherer indicates that Plaintiff incorporated one of the bonus advances of $35,000 into Defendant Scherer's monthly paycheck, resulting in a monthly salary of $8,333.33, (id. at Ex. A), that Plaintiff paid him an additional $35,000 bonus advance on September 16, 2011, (id. at Ex. B), and that Plaintiff included his final bonus payment of $53,484.59 in Defendant Scherer's final paycheck for the year, (id. at Ex. A). The parties have not provided any pay records from 2012. However, Plaintiff asserts that from October 1, 2011 to October 8, 2012, Defendant Scherer received $131,864.89 in base salary and bonuses relating to his commissions. (McMahon Decl.[9] at ¶ 24).

---

[7] This final bonus payment was calculated as follows: Defendant Scherer's overall commissions earned for Plaintiff in 2011 was deducted by Defendant Scherer's salary twice, then twenty-five percent of the resulting figure was further deducted by the bonus payments that Defendant Scherer had already received throughout the year, the medical expenses paid by Plaintiff, and a bonus overpayment from the previous year. (Docket No. 128-2).

[8] Refers to the declaration of John Scherer submitted in opposition to Plaintiff's motion for damages. (Docket No. 128).

[9] Refers to the initial declaration of Andrew McMahon submitted in support of Plaintiff's motion for damages. (Docket No. 118).

On September 28, 2011, while still employed with Plaintiff, Defendant Scherer and his wife, Defendant Tilearcio, formed Scherer Utility and began conducting and soliciting business with at least one of Plaintiff's customers. (Summary Judgment Order at 14-18). In October 2011, on behalf of Scherer Utility, Defendant Scherer represented a manufacturer, Partner Technologies, Inc. ("PTI"), in a transaction with Plaintiff's customer, Con Edison. (*Id.* at 15-16). This transaction resulted in $271,806 in sales. (*Id.* at 16). In January 2012, Plaintiff paid for Defendant Scherer to attend a trade show on its behalf, where Defendant Scherer instead approached manufacturers to solicit their business for Scherer Utility sales. (*Id.* at 45). Finally, in September 2012, Defendant Scherer sought and received a $19,528.42 advance from Plaintiff in the form of a check that cleared on October 7, 2012. (*Id.* at 19). Defendant Scherer resigned from the company the following day. (*Id.* at 19-20).

Defendant Scherer notes that notwithstanding these activities, he continued to perform in his position with Plaintiff during this period. (Inquest Hr'g. Tr. at 95). In support of this, Defendant Scherer recounted a sales meeting for manufacturer Cooper Power, in which the sales manager commended Defendant Scherer for having one of the best project presentations among the ten to twelve sales representatives present. (*Id.* at 129).

When Plaintiff recovered its company-issued laptop and cellphone from Defendant Scherer when he left its employ, it found that client and customer information, license software, e-mail correspondence with proprietary price lists, invoices, orders, and contracts had been deleted. (Summary Judgment Order at 22). Defendant Scherer had copied and retained them for his own use. (*Id.* at 22). On the date Defendant Scherer resigned, he e-mailed several of Plaintiff's clients to inform them that he had resigned but wanted to continue representing them in the New York and New Jersey area through his new company. (*Id.* at 24). Within weeks,

Defendant Scherer claimed to be representing five of Plaintiff's former manufacturer clients: Plymouth Rubber Europa, S.A. ("Plymouth Rubber"), Connector Products, Inc ("CPI"), Phoenix Wire and Cable Inc. ("Phoenix"), KoCos, Inc. ("KoCos") and Schonstedt Instrument Company ("Schonstedt"). (Summary Judgment Order at 23; OSC H'rg. Pl. Ex.[10] 5).

Prior to 2012, Plymouth Rubber had a "house account" with Con Edison, which Mr. McMahon explained to be an account with a customer from which Plaintiff did not earn commissions. (OSC Hr'g. Tr. at 48). Mr. McMahon testified that this house account resulted in one million dollars in sales annually, which he claimed to know because the manufacturer reported the sales figure to him directly. (Inquest Hr'g. Tr. at 85). On September 20, 2012, Plymouth Rubber sought to amend the existing contract with Plaintiff, such that Plaintiff would receive a five percent commission on those existing customer accounts. (Docket No. 141-4). Mr. McMahon asserted that, as a result of this transition from a house account to a commissioned account, Plaintiff anticipated $50,000 in annual commissions from its representation of Plymouth Rubber. (McMahon Supp. Decl.[11] at ¶ 8). Following Defendant Scherer's departure from Plaintiff's employment, Mr. McMahon was contacted by a Plymouth Representative who informed him that they would be "leaving Shamrock [Power]" and instead working with Scherer Utility. (McMahon Supp. Decl. at ¶ 9). Plaintiff asserts that it "lost business from Plymouth" for one year, resulting in lost commissions of approximately $50,000. (McMahon Supp. Decl. at ¶ 10). In response, Defendant Scherer puts forth evidence that, while Defendant Scherer worked

---

[10] Refers to exhibits presented by the Plaintiff at the Order to Show Cause hearing on December 21, 2012.

[11] Refers to the supplemental declaration of Mr. McMahon, filed in further support of Plaintiff's motion for damages on July 8, 2016. (Docket No. 141-3).

for Plaintiff, his sales for Plymouth Rubber in 2011 only resulted in $2,671.98 of commissions for Plaintiff. (Rones Decl.[12] at Ex. K).

Next, Mr. McMahon attested that prior to October 2012, Plaintiff represented and sold products for CPI, and its commissions from those sales in 2012 amounted to $44,270.82. (McMahon Supp. Decl. at ¶ 15).  Mr. McMahon also received word that CPI was "leaving Shamrock [Power] and going to Scherer Utility," and as a result of this, "Shamrock [Power] lost business from CPI for a period of one year, resulting in lost commissions of approximately $44,000." (*Id.* at ¶¶ 16-17).  In response, Defendant Scherer notes that his sales for CPI, while in the employ of Plaintiff, only resulted in $18,365.56 of commission for Plaintiff in 2010 and 2011. (Rones Decl. at Ex. M).

Prior to October 2012, Plaintiff represented and sold products for Phoenix and, in support of its claim for damages, submitted evidence of commissions in 2012 of $170.49.[13] (McMahon Supp. Decl. at ¶ 19, Ex. 3).  Phoenix also informed Plaintiff that it was "leaving Shamrock [Power] and going to Scherer Utility[.]" (McMahon Supp. Decl. at ¶ 20).  Defendant Scherer confirmed this, stating that Phoenix "didn't have a contract with Andy [McMahon], with Shamrock [Power].  So he signed on board pretty quickly." (Inquest Hr'g. Tr. at 133).  Plaintiff has not put forth any evidence that Phoenix ever resumed doing business with Shamrock Power.

Regarding KoCos, Plaintiff submitted evidence that Shamrock Power earned $3,935.90 from its KoCos sales in 2012, prior to the announcement that KoCos was "leaving Shamrock

---

[12] Refers to the declaration of Kenneth Rones in opposition to Plaintiff's motion for damages, filed on May 27, 2016. (Docket No. 129).

[13] Mr. McMahon's initial declaration attested to annual commissions of approximately $5,000 from sales for Phoenix. (McMahon Decl. at ¶ 11).  The Court requested supplemental briefing from Plaintiff regarding its allegations of lost profits based on some discrepancies between the figures presented at the hearing and those presented in Mr. McMahon's initial declaration. (Inquest Hearing Tr. at 196).  In response, Plaintiff provided these amended numbers.

[Power] and going to Scherer Utility[.]"[14] (McMahon Supp. Decl. at ¶¶ 23-24). Mr. McMahon attested that Plaintiff lost business from KoCos for approximately six months, resulting in lost commissions of approximately $2,000. (McMahon Supp. Decl. at ¶ 25). In response, Defendant Scherer put forth evidence that the earnings from his sales with KoCos, while employed by Plaintiff in 2009 through 2010, were only $2,160. (Rones Decl. at Ex. N).

Finally, Mr. McMahon attested that in 2012 Plaintiff earned $7,172.33 in commissions from its representation of Schonstedt prior to the manufacturer "leaving Shamrock [Power] and going to Scherer Utility[.]"[15] (McMahon Supp. Decl. at ¶¶ 27-28). Plaintiff "lost business from Schonstedt for approximately six months[,]" which Plaintiff asserts resulted in lost commissions of $3,550. (McMahon Supp. Decl. at ¶ 29). Defendant Scherer attested that Plaintiff's commissions from his sales for Schonstadt were only $3,589 in 2011 and $1,352.40 in 2009-2010. (Rones Decl. at Exs. L, O).

Defendant Scherer confirmed that he inquired as to whether these five manufacturers "would [] be willing to change contracts with Shamrock [Power] and allow [Defendant Scherer] to represent [them] in the New York City area, and have Shamrock [Power] represent them in New England and upstate New York." (Inquest Hr'g. Tr. at 132). He also confirmed that Plymouth Rubber, CPI, KoCos, Phoenix and Schonstedt "came with [him]." (Inquest Hr'g. Tr. at 135).

---

[14] Mr. McMahon's initial declaration attested to annual commissions of approximately $20,000 from sales for KoCos. (McMahon Decl. at ¶ 15). The Court requested supplemental briefing from Plaintiff regarding its allegations of lost profits based on some discrepancies between the figures presented at the hearing and those presented in Mr. McMahon's initial declaration. (Inquest Hearing Tr. at 196). In response, Plaintiff provided these amended numbers.

[15] Mr. McMahon's initial declaration attested to annual commissions of approximately $20,000 from sales for Schonstadt. (McMahon Decl. at ¶ 19). The Court requested supplemental briefing from Plaintiff regarding its allegations of lost profits based on some discrepancies between the figures presented at the hearing and those presented in Mr. McMahon's initial declaration. (Inquest Hearing Tr. at 196). In response, Plaintiff provided these amended numbers.

In addition to Plaintiff's former clients, Defendant Scherer also claimed to be representing other manufacturers who competed directly with Plaintiff's clients within weeks of resigning from his position. (Summary Judgment Order at 23).  Specifically, Plaintiff notes that Defendant Scherer has earned commissions in sales for manufacturers Bierer, Bridgeport Magnetic Group, Electrical Safety Products, Electroline, Elliott Industries, Evluma, Grid Sentry, Kortick, New England Ropes and Utility Composite Poles, all of whom Plaintiff asserts are direct competitors of manufacturers that Plaintiff represented while Defendant was in its employ. (Inquest Hr'g. Tr. at 18-34).  Defendant Scherer disputes this assertion, stating that some of the competitors noted by Shamrock Power were not manufacturers with which he worked while employed by Shamrock Power, (*id.* at 146-47, 150, 151), and in other instances remarking on the differences in the products made by Shamrock Power's manufacturers and those made by his clients, (*id.* at 148, 151, 152, 159).  Plaintiff also notes that Defendant Scherer earned the commissions with the above-listed manufacturers, as well as with Tiiger -- another manufacturer represented by Defendant Scherer -- through sales with utility companies with whom Defendant Scherer was able to make contact through his misappropriation of Plaintiff's trade secrets. (*Id.* at 25).

Plaintiff filed the instant complaint on December 10, 2012, alleging fourteen causes of action. (Docket No. 1).  On December 11, 2012, Judge Karas entered a temporary restraining order ("TRO") enjoining Defendants Scherer and Scherer Utility Sales, LLC from using or disclosing Plaintiff's confidential, proprietary, or trade secret information, from soliciting or otherwise initiating any further contact or communication with any of Plaintiff's customers, and from using the e-mail address jscherer15@msn.com for commercial purposes. (Docket No. 3 at 3).  After the entry of the TRO, Defendants Scherer and Tilearcio contacted Plaintiff's clients

and customers and instructed them to communicate with them using Defendant Tilearcio's e-mail address instead of that enjoined by the Court. (Summary Judgment Order at 25).

Plaintiff thereafter moved for a preliminary injunction, which was entered on December 27, 2012. (Docket No. 17). The preliminary injunction enjoined Defendants from, *inter alia*, using, disclosing or further converting Plaintiff's confidential proprietary or trade secret information, and soliciting or otherwise initiating any further contact or communications with any of Plaintiff's customers through the use of Plaintiff's trade secrets. (*Id.* at ¶ a). Less than one month later -- on January 3, 2013 -- Defendant Scherer formed a new business, Storm King Power Sales, LLC, and transferred contracts with manufacturers and accounts receivable to that entity. (Summary Judgment Order at 25).

On January 16, 2013, Plaintiff filed a proposed order to show cause why Defendants should not be held in contempt for violating the preliminary injunction. (Docket No. 23). At the show cause hearing on January 31, 2013, Defendants conceded that they violated the preliminary injunction and represented that they were "going out of business totally." (Summary Judgment Order at 27). The Court entered a Contempt Order, finding that Defendants were in contempt of the December 27, 2012 preliminary injunction order, and ordered Defendants to comply. (Docket No. 32). Specifically, the Court ordered Defendants to "immediately begin the process of canceling all current contracts with their manufacturers/clients. Those contracts [were] to be terminated as soon as practicable, taking into consideration any notice requirements." (*Id.* at ¶ 4). Additionally, Defendants were "directed to pay into an escrow account held by McCarter & English LLP, all commissions or other funds they ha[d] received from manufacturers/clients since October 1, 2012 or [would] receive in the future . . . until further order of this Court." (*Id.* at ¶ 5).

On September 30, 2015, Judge Karas granted Plaintiff's motion for summary judgment on five claims: breach of fiduciary duty, misappropriation of trade secrets, fraud in the inducement, faithless servant, and unjust enrichment. (*See generally* Summary Judgment Order). In recounting the facts of the case, Judge Karas held that Defendants violated the Contempt Order "by canceling and then reinstating contracts with the same entities with whose contracts the Court directed Defendants to terminate." (*Id.* at 28). Judge Karas noted that Defendants purported to dispute this violation by stating that Defendant Scherer's new entity Storm King Power Sales, LLC was reestablished "without any of Shamrock [Power]'s previous manufacturers." (*Id.* at 28 n.34). Judge Karas rejected that argument because "the Contempt Order required Defendants to 'immediately begin the process of canceling all current contracts with their manufacturers/clients,' and did not specify that Defendants need only to cancel contracts with Shamrock [Power]'s previous manufacturers/clients." (*Id.*). Furthermore, Judge Karas found that Defendants violated the Contempt Order by receiving commissions and other funds from reinstated contracts and failing to pay those funds into escrow when the Contempt Order did "not limit this requirement to funds earned from Shamrock [Power]'s previous manufacturers/clients." (*Id.* at 28 n.35).

## II. DISCUSSION

In its memorandum in support of its motion for damages, Plaintiff seeks lost profits for the breach of fiduciary duty claim, all compensation paid to Defendant Scherer during his period of disloyalty for the faithless servant claim, disgorgement of illicit gains for the misappropriation of trade secrets claim, actual pecuniary loss for the fraud in the inducement/unjust enrichment claims, prejudgment interest, punitive damages in the amount of Plaintiff's attorneys' fees,

attorneys' fees for Plaintiff's contempt filings and a permanent injunction against Defendants. (Docket Nos. 116, 132).

## A. Legal Standards

Where a federal court exercises diversity jurisdiction, state law provides the proper rule for calculating damages. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 437 (1996). On an inquest for damages, the Court must determine whether Plaintiff "has presented sufficient evidence to enable the Court to ascertain with reasonable certainty the amount of damages recoverable . . . ." *Avalon Risk Management Insurance Agency, LLC v. Rossano*, No. 12cv3934 (LGS) (DF), 2016 WL 2851435, at * 3 (S.D.N.Y. March 31, 2016) (citing *N.Y. Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.*, 657 F. Supp. 2d 410, 422 (S.D.N.Y. 2009)). "In New York, the damages recoverable in tort actions cannot be contingent, uncertain, or speculative; but if the fact is established that the plaintiff has sustained an actionable injury as the direct result of the defendant's wrongful act, [only] reasonable certainty as to the amount of that injury ... is required." *New York Youth Club v. Town of Harrison*, No. 12-CV-7534 (CS), 2016 WL 3676690, at *2 (S.D.N.Y. July 6, 2016) (quoting *Wallace v. Suffolk Cty. Police Dep't*, 809 F. Supp. 2d 73, 81 (E.D.N.Y. 2011) (alterations in original)). Additionally, Plaintiff is "not obligated to offer a mathematically precise measure of [its] damages." *Electro-Miniatures Corp. v. Wendon Co., Inc.*, 771 F.2d 23, 27 (2d Cir. 1985). Where plaintiff's injury is "not susceptible to exact measurement because of the defendant's conduct, [there is] some latitude to 'make a just a[nd] reasonable estimate of damages based on relevant date." *Id.* (citing *Bigelow v. R.K.O. Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).

**B. Plaintiff's Motion to Strike**

Plaintiff contends that Paragraphs 13-14, 22, 24, 26, 28 and 32 of the Scherer Declaration and Paragraph 4 of Defendant Tilearcio's Declaration (the "Tilearcio Declaration"[16]) should be stricken or disregarded from the record pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.[17] (Docket Nos. 134, 135).

Under Rule 12(f) of the Federal Rules of Civil Procedure, courts may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f).  In general, "[t]o prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (internal quotation and citation omitted); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible.").

Rule 12(f) "allows a court to strike *pleadings* only." *Granger v. Gill Abstract Corp.*, 566 F.Supp.2d 323, 334 (S.D.N.Y. 2008) (emphasis added) (citations omitted).  "Motions, declarations and affidavits are not pleadings," and therefore may not be the subject of a motion

---

[16] Refers to Defendant Tilearcio's declaration submitted in opposition to Plaintiff's Motion for Damages. (Docket No. 130).

[17] Plaintiff points to 28 U.S.C. § 1746 and Fed. R. Civ. P. 56 as alternative bases for its Motion to Strike.  A review of the Scherer and Tilearcio Declarations reveals that they were signed by the declarants under penalty of perjury and are, therefore, in compliance with the requirements of 28 U.S.C. § 1746. (*See* Summary Judgment Order at 39-40) ("Under 28 U.S.C. § 1746, a declaration must be subscribed as true under penalty of perjury, and dated, in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).").  Additionally, Fed. R. Civ. P. 56 is inapposite, as the declarations sought to be stricken here were not submitted in connection with a motion for summary judgment. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a *motion for summary judgment* to be supported with affidavits based on personal knowledge....") (emphasis added).

to strike. *Id.* at 335 (citing Fed. R. Civ. P 7(a) (defining pleadings as the complaint, answer,

counter- and cross-claims)); *see* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 1380 (3d ed. 2004) ("Matter outside the pleadings normally is not considered on

a Rule 12(f) motion; for example, affidavits in support of or in opposition to the motion typically

may not be used."); *Sierra v. United States*, No. 97 Civ. 9329(RWS), 1998 WL 599715, at *9

(S.D.N.Y. Sept. 10, 1998) (denying plaintiff's motion to strike defendant's motion to dismiss

because a motion is not a pleading).  In sum, a motion to strike is only proper when directed at

pleadings within the meaning of Fed. R. Civ. P. 7(a).  The Scherer and Tilearcio Declarations are

not pleadings, and are thus not properly subject to a Rule 12(f) motion to strike.

  Furthermore, Plaintiff's Motion to Strike fails to the extent that it seeks to strike, among

other assertions, inconsistent testimony in the Scherer and Tilearcio Declarations since

"Rule 12(f) does not allow a document to be stricken because it is allegedly inconsistent with a

previous position."  *Granger*, 566 F.Supp.2d at 334 (S.D.N.Y. 2008); *see Trinidad v. Pret A*

*Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 554 (S.D.N.Y. 2013) citing *Mueller v. Towers,* 3:10–

CV–1093 (WWE), 2010 WL 4365771, at *2 (D. Conn. Oct. 25, 2010) ("A motion to strike is not

an appropriate vehicle through which to contest the credibility of a witness or to draw further

attention to the fact that one piece of evidence is contradicted by another.").  Moreover, Plaintiff

fails to fashion any argument, as required under Rule 12(f), as to why the assertions sought to be

stricken will result in even a scintilla of prejudice to the Plaintiff.  *Hochroth v. William Penn Life*

*Ins. Co. of N.Y.*, No. 03CIV.7286 (RJH)(HBP), 2003 WL 22990105, at *2 (S.D.N.Y. Dec. 19,

2003) (denying a movant's 12(f) motion to strike for failing "to identify any prejudice that might

result from the challenged language").  Finally, although Plaintiff cites to cases in which the

Court has struck affidavits under its "inherent authority to strike any filed paper which it

determines to be abusive or otherwise improper under the circumstances," *see Nat. Res. Def. Council, Inc., v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 116 n.5 (S.D.N.Y. 2012) (citing *In re Bear Stearns Cos., Inc., Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 581 (S.D.N.Y. 2011)), I do not find these statements to be abusive or improper. Plaintiff's arguments that the statements are false and contrary to law merely go to the weight the Court should give to them in light of all of the evidence submitted in this case. The drastic remedy of striking them is not warranted here.

Accordingly, I respectfully recommend that Plaintiff's Motion to Strike be denied.

**C. Defendants' July 13, 2016 Letter**

By way of a letter dated July 13, 2016, Defendants ask the Court to strike and disregard: (a) the Supplemental Declaration of Andrew McMahon; and (b) the excerpts of John Scherer's March 28, 2016 deposition testimony attached to Plaintiff's letter of July 8, 2016. (Docket No. 142; *see generally* McMahon Supp. Decl.; Docket No. 141-1). Defendants argue that they "do not believe that the Court had solicited from [ ] Plaintiff" the information adduced in the Supplemental Declaration of Andrew McMahon and that the deposition excerpts are "beyond the scope of the issue before the Court[.]" (Docket No. 142 at 1-2).

The Court directs Defendants to the June 30, 2016 inquest hearing transcript, wherein the undersigned explicitly requested that Plaintiff provide these materials to the Court. (Inquest Hr'g Tr. at 113, 195-196, 200). Accordingly, I respectfully recommend that the requests set forth in Defendants' letter of July 13, 2016 be denied.

**D.  Damages for Breach of Fiduciary Duty**

Under New York law, where an employee breaches the common law duty of loyalty to an employer, the employer has a choice "to seek damages (1) through an accounting of the disloyal employee's gain (profit disgorgement) or (2) as a calculation of what the employer would have made had the employee not breached his or her duty of loyalty to the employer." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 523 (S.D.N.Y. 2011) (citing *Gomez v. Bicknell*, 302 A.D.2d 107, 114 (2d Dep't 2002); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 211 n.23 (2d Cir. 2003)).  The employer may also demonstrate "a usurpation of corporate opportunity in connection with a breach of the duty of loyalty." *Pure Power*, 813 F. Supp. 2d at 523.  Known as the corporate opportunity doctrine, this "prohibits a corporate employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation." *Am. Fed. Grp. Ltd v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998).  The doctrine applies to employees even after their employment period ends. *Pure Power*, 813 F. Supp. 2d at 523.  However, the doctrine is limited to "business opportunities in which a corporation has a 'tangible expectancy,' which means 'something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope.'" *Id.* (citing *Alexander & Alexander, Inc. v. Fritzen*, 147 A.D.2d 241, 247-48 (1989)).  In *Pure Power*, the Court found that the plaintiffs failed to show that the corporate opportunity of the plaintiffs was usurped when the clients that the defendants solicited "merely chose not to renew their subscriptions at [the plaintiffs' business]." 813 F. Supp. 2d at 524.

Plaintiff has elected to seek lost commissions for the five manufacturing clients that Defendants retained in the immediate weeks following Defendant Scherer's termination of his employment with Shamrock Power: Plymouth Rubber, CPI, Phoenix, KoCos, and Schonstedt.

Plaintiff asserts that it had a tangible expectancy in the commissions from its existing manufacturer clients, and it has provided its best estimates of what those commissions would have been for the period of time in which each client engaged Defendants in the place of Plaintiff. The Court will address each manufacturer in turn.

### i. Plymouth Rubber

Mr. McMahon testified that Plaintiff had already been representing Plymouth Rubber in a "house account" with Con Edison, which, shortly before Defendant Scherer left Plaintiff's employment, had been converted to a commission account in which Shamrock Power would have received five-percent commission on all existing accounts, including the existing work with Con Edison. (Inquest Hr'g. Tr. at 84-85). This formal agreement between Plaintiff and Plymouth Rubber, along with Mr. McMahon's testimony that manufacturers rarely terminated contracts, (OSC Hr'g. Tr. at 109), indicates that Plaintiff did in fact have a tangible expectancy in these commissions. Additionally, I note that Plaintiff only lost this business with Plymouth Rubber for a period of one year, resulting in lost commissions of approximately $50,000. (McMahon Supp. Decl. at ¶10). The fact that Plymouth Rubber returned to working with Shamrock Power in the New York region is a further indication that, but for Defendants' actions, Shamrock Power would have retained this account with Plymouth Rubber. I, therefore, respectfully recommend that Plaintiff is entitled to any lost profits from the usurpation of this account.

Regarding quantity of commissions that Plaintiff could have expected, Mr. McMahon testified that he knew that the account would result in $1,000,000 of sales and $50,000 in commissions annually because this information was provided to him by the manufacturer. (Inquest Hr'g. Tr. at 85). I respectfully recommend that this is a sufficient degree of certainty in

a damages calculation to award damages for these lost profits,[18] and that Plaintiff should be awarded $50,000 for Defendant Scherer's breach of fiduciary duty as it relates to Plymouth Rubber.

### ii. CPI, KoCos, and Schonstedt

Mr. McMahon attested that Plaintiff had been representing manufacturer CPI, and earned $44,270.82 from sales in 2012, prior to CPI retaining Defendants in place of Shamrock Power. (McMahon Supp. Decl. at ¶ 15).  With respect to KoCos, Mr. McMahon attested that Shamrock Power earned $3,935.90 in annual commissions from its representation of KoCos in 2012. (McMahon Supp. Decl. at ¶ 23).  Finally, Mr. McMahon attested that Plaintiff earned $7,172.33 in annual commissions from sales for Schonstedt in 2012. (McMahon Supp. Decl. at ¶ 27).  In response, Defendants provide Defendant Scherer's sales figures from his representation of these three manufacturers on behalf of Shamrock Power, dating back to 2009, which indicate that Defendant Scherer's sales resulted in Plaintiff earning commissions that were substantially lower in 2009, 2010 and 2011 than Plaintiff's figures for 2012. (Rones Decl. at Ex. L, M, N, O).  These records, in addition to the factors considered above regarding Mr. McMahon's testimony on the nature of his business relationships and the fact that all three of these manufacturers also returned to Shamrock Power after a period of time, establish that Plaintiff had a long-standing relationship with CPI, KoCos and Schonstedt that resulted in a tangible expectancy in these commissions.

Regarding the calculation of the lost profits from these accounts, the Court credits Plaintiff's testimony that the commissions lost through the diversion of this business to

---

[18] In response, Defendants assert that Defendant Scherer's sales for Plymouth Rubber in 2011 only resulted in Plaintiff earning $2,671.98 in commissions. (Rones Decl. at Ex. K).  This figure clearly does not take into account the change in the agreement between Plymouth Rubber and Plaintiff, which Defendants do not dispute. Accordingly, I do not find that the commissions that Plaintiff earned off of Defendant Scherer's sales for Plymouth Rubber in 2011 are an accurate estimate of Plaintiff's lost profits for the one year period in which Plymouth Rubber retained Defendants.

Defendants amounted to $44,270.82 for CPI over a one-year period, $1,967.95 for KoCos over a

six-month period, and $3,586.16 for Schonstedt over a six-month period. (McMahon Supp. Decl.

at ¶¶ 17, 25, 29).  The Court notes that Defendant Scherer testified that he only sought and

obtained agreements to represent these manufacturers in the New York region, with the

understanding that Plaintiff would continue to represent them in other regions, such as New

England. (Inquest Hr'g. Tr. at 132).  Plaintiff has asserted that these clients "left Shamrock

[Power]" and that Plaintiff "lost business from" the manufacturers, but it is not clear whether the

lost business was just in the New York region, or elsewhere as well. (McMahon Supp. Decl. at

¶¶ 10, 17, 21, 25, 29).  Defendant Scherer's documentation showing that his sales in the New

York region for Shamrock Power resulted in commissions that were less than half the annual

commissions, as asserted by Plaintiff, give the Court pause as to whether Plaintiff is basing its

calculation of past commissions earned on just the New York region or on all geographic regions

in 2012.  If Defendant Scherer is correct that Plaintiff merely lost the opportunity to represent

these manufacturers in the New York region -- and the commissions as reported by Plaintiff were

for all regions -- the figures provided by Plaintiff would not be an accurate estimation of

Plaintiff's lost profits.  However, Defendant Scherer has provided no support for his allegation

that Plaintiff retained these manufacturers in other regions, (Inquest Hr'g. Tr. at 189), and

although Defendants could have obtained documentation during the damages discovery to

disprove Plaintiff's assertion that its lost commissions amounted to the figures asserted, they

failed to do so.  Accordingly, the Court credits Mr. McMahon's attestation that Plaintiff lost

profits in the amount of $44,270.82 for the one year of lost business with CPI, $1,967.95 for six

months of lost business with KoCos, and $3,586.16 for six months of lost business with

Schonstedt.  I respectfully recommend that Plaintiff be awarded $49,824.93 for the breach of fiduciary duty claim with respect to CPI, KoCos, and Schonstedt.

### iii. Phoenix

Finally, Mr. McMahon attested that Plaintiff earned $170.49 from sales in 2012 on behalf of Phoenix, prior to Phoenix "leaving Shamrock [Power] and going to Scherer Utility[.]" (McMahon Supp. Decl. at ¶¶ 19, 20).  Unlike the other manufacturers, Phoenix never returned to work with Plaintiff. (McMahon Decl. at ¶ 13).  Additionally, Defendant Scherer noted in his testimony that Plaintiff did not have a contract with Phoenix, and as a result Phoenix was able to sign up with Defendants more quickly than the other manufacturers. (Inquest Hr'g. Tr. at 133).

In this instance, I find that Plaintiff did not have a tangible expectancy in its commissions from Phoenix.  Unlike in other instances, where Plaintiff had contracts with manufacturers that renewed automatically at the conclusion of their terms, Plaintiff had no contract with Phoenix, there is no assertion that the two companies had a long history of working together, and Defendant Scherer's testimony demonstrates how easily Phoenix was able to terminate its relationship with Plaintiff.  As such, I find that Defendants did not usurp Plaintiff's corporate opportunity to continue business with Phoenix, where the manufacturer "merely chose not to renew" its dealings with Plaintiff. *See Pure Power*, 813 F. Supp. 2d at 524.  I respectfully recommend that Plaintiff not be award lost profits for the breach of fiduciary duty claim as it relates to Phoenix.

Accordingly, I respectfully recommend that Plaintiff be awarded $99,824.93 in total lost profits from Plymouth Rubber, CPI, KoCos and Schonstedt because of Defendant Scherer's breach of his fiduciary duty.

## E. Damages for Faithless Servant

"A faithless servant forfeits all compensation earned during the period of his disloyalty even if his services benefited the principal in some part." *Shamrock Power Sales, LLC*, 2015 WL 5730339, at *24 (citing *Tyco Int'l*, 756 F. Supp. 2d at 562). "However, the Second Circuit has carved out a limited exception where compensation is expressly allocated among discrete tasks, such as commissions. In such cases, the employee may keep compensation derived from any transaction that were separate from and untainted by the disloyalty." *Stanley v. Skowron*, 989 F. Supp. 2d 356, 360 (S.D.N.Y. 2013); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 301-02 (2d Cir. 2006) (apportioning compensation where employee was a sales representative paid partially through individual sales commissions); *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 146-47 (2d Cir. 1998) (apportioning compensation where employment contract provided that employee would receive fee for each leasing transaction completed). As Judge Karas noted in the Summary Judgment opinion:

> For apportionment to be available, the following requirements must be met: (1) the parties must have agreed that the agent will be paid on a task-by-task basis, for example a commission on sales, (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks neither tainted nor interfered with the completion of the tasks as to which the agent was loyal.

(Summary Judgment Order at 52 (quoting *Phansalkar*, 344 F.3d at 205 (quotation marks and citations omitted))). Where an employee is paid a base salary as well as a performance bonus, which are linked to his performance but not "to separate and discrete transactions[,]" apportionment is not available. *Stanley*, 989 F. Supp. 2d at 363. Whether a bonus is calculated monthly or yearly instead of by the transaction can be telling in determining whether it is a performance bonus or a task-by-task commission, subject to apportionment. *Id.* at 363.

Judge Karas concluded that Plaintiff was at least entitled to restitution of some or all of Defendant Scherer's salary for the period of employment during his disloyalty, but noted that the exact amount of compensation was to be determined at the inquest hearing, where the parties could propound evidence on whether apportionment was warranted. (Summary Judgment Order at 52-53). In finding that Defendant Scherer had been a faithless servant, Judge Karas relied on Defendant Scherer's activities beginning on September 28, 2011 through the date of his resignation: October 8, 2012. Accordingly, I find that Plaintiff's proposed period of disloyalty of October 1, 2011 to October 8, 2012, which Defendants do not contest, is appropriate.

All parties agree that Defendant Scherer was paid a base salary of $65,000 per annum, all of which must be forfeited. At the inquest hearing, Defendants put forth evidence that he continued to perform well in his position during this period, noting that he had one of the best project presentations at a sales meeting for manufacturer Cooper Power in 2012. (Inquest Hr'g. Tr. at 129). Defendants do not provide any evidence that Defendant Scherer engaged in no misconduct at all with respect to certain accounts or that his disloyalty neither tainted nor interfered with the completion of his tasks for specific accounts. *See Stanley*, 989 F. Supp. 2d at 363 ("[The employee] is only entitled to retain some portion of his compensation if he was paid on a 'task-by-task' basis and can demonstrate that certain transactions were wholly untainted by his disloyalty.").

Additionally, although Defendant Scherer received bonuses related to the commissions that he earned for Plaintiff, it does not appear that he was paid on a task-by-task basis. Defendant Scherer's bonus -- which he appears to have received in multiple payments throughout the year, some of which were included in his monthly paycheck -- was calculated using a mathematical formula that began with Defendant Scherer's overall commissions earned,

deducted his salary twice, and then took twenty-five percent of the resulting figure. (Docket No. 128-2). Even if Defendants had put forth evidence that certain accounts were not tainted by his disloyalty, there would be no method for the Court to apportion commissions earned on those individual accounts because Defendant Scherer was not paid a bonus on each individual account; he was paid a performance bonus based on his commissions as a whole. As such, I respectfully recommend that Defendant Scherer's bonus payments be deemed performance bonuses and not task-by-task commissions and, therefore, they should not be apportioned.

Mr. McMahon attested that Plaintiff paid Defendant Scherer $131,864.89 in salary, commissions and advances against commissions from October 1, 2011 to October 8, 2012. (McMahon Decl. at ¶ 24). In support of this assertion, Plaintiff submitted Exhibit 8 at the Inquest Hearing, which shows net pay of $118,532.30 for the same period. (Inquest Hr'g. Pl. Ex.[19] 8). Mr. McMahon testified that bonus advances paid to Defendant Scherer were not included in this figure -- including the advance of $19,528.42 given to Defendant Scherer on October 3, 2012 -- which Judge Karas found to warrant a finding of fraud in the inducement and unjust enrichment. (Inquest Hr'g. Tr. at 111). However, the Court has reviewed Plaintiff's Exhibit 8, and finds that a salary paycheck of $19,528.42 from October 3, 2012 was, in fact, included in this calculation. As such, the Court cannot credit Mr. McMahon's testimony that this advance was not included in the net pay as reported on the Payroll Item Detail and, absent any other evidence of additional advances, finds that the Defendant Scherer received payment during the period of his disloyalty in the amount of $118,532.30.

Accordingly, I respectfully recommend that Plaintiff be awarded damages of $118,532.30 for its faithless servant claim.

---

[19] Refers to exhibits presented by the Plaintiff at the Inquest Hearing on June 30, 2016.

**F. Damages for Misappropriation of Trade Secrets**[20]

Under New York Law, a plaintiff may seek damages for misappropriation of trade secrets

through one of three methods: "compensation for plaintiff's losses, an accounting of defendant's

profits, or a reasonable royalty[.]" *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d

250, 268 (S.D.N.Y. 2005). Plaintiff seeks disgorgement of Defendant Scherer's unjust

earnings[21] from commissions resulting from sales following his departure from Shamrock Power.

(Docket No. 116 at 10). The Second Circuit has deemed an accounting of defendant's profits to

be "an appropriate measure of damages under New York law" for a misappropriation of trade

secrets claim. *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955,

969 (2d Cir. 1997).

To calculate the total amount of unjust earnings, Plaintiff maintains that it is entitled to

commissions that Defendant Scherer has earned by "selling products that directly compete with

manufacturers represented by Shamrock [Power] to customers to whom [Defendant] Scherer was

introduced while employed at Shamrock [Power]." (Docket No. 116 at 14-15). Based on

documentation produced by Defendants in the damages discovery, Plaintiff asserts that the total

commissions unjustly received by Defendants amount to $64,489.05. (Docket No. 116 at 15).

Plaintiff bases this on commissions earned through sales of manufacturers PTI, Kortick

Manufacturing ("Kortick"), New England Ropes ("NE Ropes"), Elliott Industries ("Elliott"),

---

[20] Defendants argue that Judge Karas did not refer the misappropriation of trade secrets claim to this Court for purposes of conducting a damages inquest. (Opposition at 3). However, Judge Karas' November 14, 2016 Amended Order of Reference clarifies that the undersigned should issue a report and recommendation on this issue. (Docket No. 148). This Court will proceed accordingly.

[21] The Court notes that Plaintiff seeks overall commissions earned on these accounts, and not profit after expenses have been deducted. Given that Defendant Scherer is a sales representative -- and did not have to expend money producing the products sold, which would then be deducted from the commission received -- the Court finds that these commissions are the equivalent of Defendant Scherer's gross profit on his accounts, which is an appropriate measure of damages. *See David Fox & Sons, Inc. v. King Poultry Co.*, 23 N.Y.2d 914, 915 (1969) (holding that plaintiffs' damages should have been computed on the basis of gross profit, and not net-profit).

Tiiger, Bridgeport Magnetics ("BMG"), Electrical Safety Products, Grid Sentry, Bierer &

Associates ("Bierer"), Electroline (also known as Jenny Tools), Evluma, Travis, and Utility

Composite Poles, to customers that Defendant Scherer worked with while at Shamrock Power:

Central Hudson, Con Edison, National Grid, Orange & Rockland, PSE&G, and Turtle &

Hughes. (Docket No. 116 at 8-11). In response, Defendants allege that either the products made

by the manufacturers that he represents are not comparable to, and therefore do not compete

with, the products sold by Shamrock Power's manufacturers, or that he did not deal with the

competing manufacturers while employed with Plaintiff.[22]

      As an initial matter, the Court has only included commissions that Defendants have

actually earned, and not commissions that appear as only having been billed in Plaintiff's Inquest

Exhibits. *See Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985) (in

misappropriation of trade secrets action, "damages encompass profits unjustly *earned* by the

defendant.") (emphasis added). Additionally, Defendant Scherer admitted during the Inquest

Hearing that Shamrock Power had similar products that competed with the manufacturers

Kortick and NE Ropes. (Inquest Hr'g. Tr. at 153). Regarding the sales to Shamrock's customers

Orange and Rockland and Central Hudson of products from manufacturers Elliott Industries and

Tiiger, Defendant Scherer testified that he obtained this business through his connections with

the customers, (Inquest Hr'g. Tr. at 150, 154), and there is no dispute that these connections were

the result of his access to Plaintiff's trade secrets, (Summary Judgment Order at 55-56).

Regarding Defendant Scherer's testimony that Shamrock Power's manufacturers' products were

not comparable to those of the manufacturers that he represents, the Court does not find this

---

[22] There is no dispute that Defendant Scherer worked with these customers while at Shamrock Power and that he retained Plaintiff's trade secrets in the form of identities, locations and contact information for purchasing engineers at these customers. (Summary Judgment Order at 55-56). Mr. McMahon also testified that Defendant Scherer serviced Turtle & Hughes, a distributor, when he was in the employment of Shamrock Power, (Inquest Hr'g. Tr. at 24), which Defendant Scherer confirmed at his deposition, (Scherer Depo. Tr. at 81).

argument to be persuasive.  Defendant Scherer testified that his manufacturer BMG did not compete with Plaintiff's manufacturer Von because BMG's product weighed significantly less than Von's. (Inquest Hr'g. Tr. at 148).  However, Defendant Scherer's intimate knowledge of the Von product line is the only reason that he is able to make these comparisons to his clients' benefit.  Additionally, Defendant Scherer admitted during his deposition that Von was a competitor to BMG. (Scherer Depo. Tr.[23] at 38).  The same reasoning applies to Defendants' representation of Elliott Industries. (Scherer Depo. Tr. at 40).  The Court is also not convinced by Defendant Scherer's testimony that Grid Sentry's product did not compete with the product of Shamrock Power's manufacturer because it makes a "smart sensor," which is "smarter" than a fault indicator, (Inquest Hr'g. Tr. at 152), or that Utility Composite Solutions' poles did not compete with CMT poles because of its material and number of pieces, (Inquest Hr'g. Tr. at 159).  Defendant Scherer is only able to make this distinction based on his theft of Plaintiff's trade secrets.  Additionally, the Court does not credit Defendant Scherer's testimony that Electrical Safety Products did not compete with Shamrock Power's manufacturer, (Inquest Hr'g. Tr. at 176), as it conflicts with his deposition testimony, (Scherer Depo. Tr. at 16).  Finally, the Court notes that these discrepancies in Defendant Scherer's testimony, paired with his overall demeanor at the Inquest Hearing, have caused the Court to find that he was not a credible witness.  As such, the Court does not credit Defendant Scherer's testimony that he had no access to trade secrets regarding the competitors of Bierer, Electroline (formerly Jenny Tools), or Evluma. (Inquest Hr'g. Tr. at 146-47, 150-51).

---

[23] Refers to the transcript of the deposition of Defendant Scherer, filed in this matter on July 8, 2016. (Docket No. 141-1).

With these findings in mind, the Court concludes that Plaintiff is entitled to Defendants'

earned commissions from sales of Kortick, NE Ropes, Elliott, Tiiger, BMG, Electrical Safety

Products, Grid Sentry, Bierer, Electroline, Evluma, Travis, and Utility Composite Poles, with

customers Central Hudson, Con Edison, National Grid, Orange & Rockland, PSE&G, and Turtle

& Hughes as follows[24]:

| Customer | Manufacturer | Commissions Earned | Date Earned |
|---|---|---|---|
| Central Hudson | Bierer | $8.19 | 7/13/2014 |
| Central Hudson | Tiiger | $2,247.75 | 3/7/2015 |
| Central Hudson | Tiiger | $581.25 | 2/25/2016 |
| Con Edison | Tiiger | $36.40 | 12/20/2013 |
| National Grid | Electroline | $38.00 | 9/18/2013 |
| National Grid | Electroline | $22.00 | 10/22/2013 |
| National Grid | Electroline | $60.00 | 11/11/2013 |
| National Grid | Electroline | $27.00 | 12/16/2013 |
| National Grid | Electroline | $106.00 | 12/16/2013 |
| National Grid | Bierer | $494.48 | 1/8/2014 |
| National Grid | Electroline | $330.00 | 1/16/2014 |
| National Grid | Grid Sentry | $2,100.00 | 5/28/2015 |
| National Grid | Bierer | $3.64 | 3/1/2016 |
| National Grid | Bierer | $314.00 | 2/5/2016 |
| Orange & Rockland | Elliott | $64.49 | 8/22/2014 |
| Orange & Rockland | Elliott | $64.49 | 8/22/2014 |
| Orange & Rockland | Elliott | $64.49 | 8/22/2014 |
| Orange & Rockland | Elliott | $64.49 | 8/22/2014 |
| Orange & Rockland | Elliott | $64.49 | 8/22/2014 |
| Orange & Rockland | Elliott | $1,452.30 | 7/22/2014 |
| Orange & Rockland | Elliott | $484.10 | 7/22/2014 |
| Orange & Rockland | Elliott | $961.80 | 6/24/2014 |
| Orange & Rockland | Elliott | $961.80 | 6/24/2014 |
| Orange & Rockland | Elliott | $142.06 | 4/23/2014 |

[24] The data in this chart comes from Plaintiff's Inquest Hearing Exhibits 2-5. The Court notes that this chart does not include any entries from transactions involving manufacturers NE Ropes, Evluma, Travis or Utility Composite Poles because Defendants did not actually earn commissions from sales between these manufacturers and the six relevant company customers. Furthermore, Mr. McMahon testified at the Inquest Hearing that Travis is not a competing manufacturer. (Inquest H'rg Tr. at 40). Accordingly, the Court did not include these four manufacturers in this chart.

| Customer | Manufacturer | Commissions Earned | Date Earned |
|---|---|---:|---|
| Orange & Rockland | Elliott | $1,787.40 | 4/23/2014 |
| Orange & Rockland | Elliott | $773.10 | 2/24/2014 |
| Orange & Rockland | Elliott | $1,546.20 | 4/23/2014 |
| Orange & Rockland | Elliott | $893.70 | 2/24/2014 |
| Orange & Rockland | Tiiger | $2,747.55 | 1/30/2014 |
| Orange & Rockland | Elliott | $979.80 | 12/26/2015 |
| Orange & Rockland | Elliott | $979.80 | 12/26/2015 |
| Orange & Rockland | Elliott | $893.80 | 2/20/2015 |
| Orange & Rockland | Elliott | $893.80 | 4/17/2015 |
| Orange & Rockland | Elliott | $893.80 | 2/20/2015 |
| PSE&G | Bierer | $104.00 | 9/30/2014 |
| PSE&G | BMG | $335.79 | 12/23/2014 |
| PSE&G | BMG | $1,423.50 | 9/24/2014 |
| PSE&G | BMG | $877.50 | 10/13/2014 |
| PSE&G | BMG | $256.75 | 10/13/2014 |
| PSE&G | BMG | $273.00 | 10/13/2014 |
| PSE&G | Electrical Safety Products | $43.85 | 11/11/2014 |
| PSE&G | Electroline | $2,300.00 | 3/17/2014 |
| PSE&G | Electroline | $33.00 | 3/17/2014 |
| PSE&G | BMG | $11.70 | 11/20/2015 |
| PSE&G | BMG | $387.45 | 11/20/2015 |
| PSE&G | BMG | $5.34 | 9/10/2015 |
| PSE&G | BMG | $335.79 | 12/4/2015 |
| PSE&G | BMG | $335.79 | 2/20/2015 |
| PSE&G | BMG | $335.79 | 1/9/2015 |
| PSE&G | BMG | $3,482.82 | 3/1/2016 |
| PSE&G | BMG | $5,811.75 | 4/25/2016 |
| PSE&G | BMG | $22.50 | 2/19/2016 |
| PSE&G | Electrical Safety Products | $416.30 | 1/26/2016 |
| PSE&G | Electrical Safety Products | $115.90 | 1/26/2016 |
| Turtle & Hughes | Kortick | $7.60 | 11/7/2014 |
| Turtle & Hughes | Elliott | $767.80 | 12/26/2015 |
| | **Total:** | $40,766.09 | |

Finally, with respect to PTI, Judge Karas found that Shamrock Power was damaged "in the very least through the diversion of [PTI] sales from Shamrock to Scherer Utility." (Summary

Judgment Order at 47). The Court acknowledges that Judge Karas made this finding in connection with Plaintiff's faithless servant claim, (*id.*), and that Plaintiff now seeks damages for the same conduct within the misappropriation of trade secrets context. The Court also notes that Defendant Scherer earned these commissions prior to his departure from Shamrock Power, and that nowhere in the record does Plaintiff indicate that PTI was a competitor of a Shamrock Power manufacturer. Nonetheless, Defendant fails to oppose Plaintiff's request for recovery of these commissions in the misappropriation of trade secrets context. *See In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (recognizing that a party "concedes through silence" arguments by its opponent that it fails to address). Accordingly, the Court will permit recovery of the earned PTI commissions as follows[25]:

| Customer | Manufacturer | Commissions Earned | Date Earned |
|----------|--------------|-------------------:|:-----------:|
| Con Edison | PTI | $2,812.92 | - |
| Con Edison | PTI | $3,737.20 | - |
| Con Edison | PTI | $4,241.59 | - |
| | **Total:** | $10,791.71[26] | |

Accordingly, it is respectfully recommended that Plaintiff be awarded $51,557.80[27] in earned commissions for its misappropriation of trade secrets claim.

---

[25] The data in this chart comes from Inquest Hearing Exhibit 6.

[26] The Court notes that Defendant Scherer averred that these commissions proceeds -- "a little over $10,000" -- were deposited into the McCarter & English LLP escrow account. (Inquest Hr'g. At 126; Docket No. 76 at 4-5).

[27] This amount is less than the $64,489.05 that Plaintiff requests, (Docket No. 132 at 10), because the Court only included commissions actually earned.

**G.  Damages for Fraud in the Inducement and Unjust Enrichment**

Judge Karas found that undisputed evidence showed that Plaintiff gave Defendant Scherer an advance in October 2012 of $19,528.43, the circumstances of which were sufficient to establish Plaintiff's claim for fraud in the inducement and unjust enrichment. (Summary Judgment Order at 63, 65).  "It is well-settled that the measure of damages for an unjust enrichment claim is restricted to the 'reasonable value' of the benefit conferred upon the defendants." *Pure Power*, 813 F. Supp. 2d at 534 (citing *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009); *Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005)).  For a fraud in the inducement claim, "[t]he true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule." *Campers' World Intern., Inc. v. Perry Ellis Intern., Inc.*, No. 02 CIV.453 (RPP), 2002 WL 1870243, at *5 (S.D.N.Y. Aug. 13, 2002) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370 (N.Y. 1996)).

In this instance, the reasonable value of the benefit conferred upon Defendant Scherer and the actual pecuniary loss sustained by Plaintiff is the same: $19,528.43.  Damages for this loss, however, have already been awarded in connection with the Court's analysis of Plaintiff's faithless servant claim.  To further award damages here for the same amount granted above would be redundant and excessive. *See Softel*, 891 F. Supp. at 943 (S.D.N.Y. 1995) ("Because defendants' profits from copyright infringement and trade secret misappropriation are coextensive in this case, plaintiff is entitled to only one recovery of defendants' profits."); *Pure Power*, 813 F. Supp. 2d at 537 (S.D.N.Y. 2011) (refusing to award damages for the same conduct twice, as doing so "would be redundant and excessive").  As such, I respectfully recommend that no damages for fraud in the inducement and unjust enrichment be awarded.

## H. Prejudgment Interest

Plaintiff seeks pre-judgment interest on its damages for misappropriation of trade secrets. Under New York Civil Practice Law and Rules, prejudgment interest is "mandatory for a damage award, except when the action is equitable in nature." *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 191 (S.D.N.Y. 2002) (citing N.Y. C.P.L.R. § 5001(a)).   Where an action is equitable in nature, the Court may, in its discretion, award prejudgment interest. *Id.*   A claim for misappropriation of trade secrets has been found to be both equitable and legal in nature, depending on the type of relief sought. *See Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 330 (2d Cir. 1962) (finding a trade secret claim to be based on equitable principles); *Softel*, 891 F. Supp. at 943 (finding plaintiff's claim for damages in relation to a misappropriation of trade secrets claim to be "essentially legal in nature[.]").   Where prejudgment interest is awarded, the starting date from which the court computes interest is:

> the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.   Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

*Softel*, 891 F. Supp. at 944 (citing N.Y. Civ. Prac. L. & R. § 5001(b)).   "The annual rate of interest on the compensatory damages for trade secret misappropriation is nine percent." *Id.* (citing N.Y. Civ. Prac. L. & R. § 5004).

Here, Plaintiff initially sought injunctive relief, and now seeks both money damages and a permanent injunction for its misappropriation of trade secrets claim.   However, regardless of whether Plaintiff's claim is essentially equitable or legal in nature, I find that it would be a proper use of the Court's discretion to award prejudgment interest.   Plaintiff proposes that the date to be used for interest calculation is October 1, 2011.   However, although it is undisputed

that Defendant Scherer began Scherer Utility Sales that month, the damages awarded to Plaintiff were not incurred until various dates in 2013 through 2015, when Defendants earned profits from the misappropriation of Plaintiff's trade secrets.  Therefore, I respectfully recommend that Plaintiff be awarded prejudgment interest of nine percent on its misappropriation of trade secrets damages -- calculated from the median date of the accrual of these damages, January 5, 2015, to the date judgment is entered.

## I.  Punitive Damages

Plaintiff seeks punitive damages in the form of attorneys' fees. (Docket No. 116 at 16). New York law allows the recovery of punitive damages in a trade secrets case if the defendant's conduct has been sufficiently "gross and wanton." *See A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991); *Topps Co.*, 380 F.Supp.2d at 267 (S.D.N.Y. 2005) (finding that under New York law, punitive damages are available for misappropriation of trade secrets without proof of public harm, if the defendant's conduct is gross and wanton).  Further, in New York, it has been held that "attorneys' fees [ ] may indeed be considered on the issue of punitive damages." *Jeffries Avlon, Inc. v. Gallagher*, 567 N.Y.S.2d 339, 340 (Sup. Ct. 1991) (citing 36 N.Y. Jur.2d, Damages § 183).

Judge Karas found that undisputed evidence showed that Defendant Scherer took various confidential and proprietary data and documents from Shamrock Power, making copies of the data on his company-issued laptop and phone, which included price lists for Shamrock Power's clients. (*See* Summary Judgment Order at 57).  Judge Karas also found the undisputed evidence showed that Scherer did not disclose the October 2011 transactions with PTI to Shamrock Power, and instead "specifically instructed both PTI and Con Edison to delete Shamrock Power's name from the purchase orders, and in several follow up emails reiterated that request and

cautioned Con Edison ... 'please do not send [purchase orders] to Shamrock.'" (Summary

Judgment Order at 50).  Such conduct, paired with Defendants repeated disregard of Court

orders, (Summary Judgment Order at 28; Docket No. 32), is sufficiently gross and wanton to

permit the recovery of punitive damages. *See Paz Sys., Inc. v. Dakota Grp. Corp.*, 514 F. Supp.

2d 402, 409 (E.D.N.Y. 2007) (awarding punitive damages where defendants misappropriated

trade secrets in a particularly egregious manner, which included efforts to obscure evidence of

their conduct); *In re Cross Media Mktg. Corp.*, No. 06 CIV. 4228 (MBM), 2006 WL 2337177, at

*7 (S.D.N.Y. Aug. 11, 2006) (affirming the imposition of punitive damages in a trade secrets

case where defendant exhibited gross and wanton conduct by "taking [customer lists] without

permission and then attempting to anonymously auction the[m]").

     In their Opposition, Defendants do not contest an award of attorneys' fees, but argue that

the total amount sought is excessive and ask the Court to "limit [the award] to an amount

determined to be reasonable..." (Opposition[28] at 3).  In calculating attorneys' fees, the Court has

considerable discretion in determining the "presumptively reasonable fee," by multiplying a

reasonable hourly rate by the reasonable number of hours expended on the case. *Arbor Hill*

*Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 189-90 (2d Cir. 2008).

In determining the reasonable hourly rate, "a court must determine 'what a reasonable, paying

client would be willing to pay' for the legal services, in other words, the appropriate market rate

for counsel over the course of the number of hours appropriately worked." *Torres v. City of New*

*York*, No. 07 Civ. 3473(GEL), 2008 WL 419306, at *1 (S.D.N.Y. Feb. 14, 2008); *see also Arbor*

*Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 189-90.  When calculating the

---

[28] Refers to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Assessment of Damages. (Docket No. 131).

"presumptively reasonable fee" amount, the Court should "make any appropriate adjustments to arrive at the final fee award." *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010).  Moreover, the Second Circuit has cautioned, "attorneys' fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *N.Y. State Ass'n for Retarded Children, Inc.*, 711 F.2d at 1139 (2d Cir. 1983) (internal citations and quotations omitted).

### a) Reasonable Hourly Rate

Determination of the reasonable hourly rate "contemplates a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel [, which] may . . . include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d 204, 209 (2d Cir. 2005) (citations omitted).  Moreover, "the nature of representation and type of work involved in a case are critical ingredients in determining the 'reasonable' hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 184 n.2.  The party seeking a fee award "has the burden of showing by satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested hourly rates are the prevailing market rates." *Farbotko*, 433 F.3d at 209 (citations and internal quotation marks omitted).  "The reasonable hourly rates should be based on 'rates prevailing in the [relevant] community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* at 208.

Plaintiff's counsel has submitted attorney affidavits in support of their requested rates.

(Moore Aff.[29]; Moore Supp. Aff.[30]).  Considering the work involved here, the need for motion

practice to address Defendants' repeated misconduct, as well as the credentials of the attorneys

seeking fees, this Court finds it is appropriate to award hourly rates as follows:

| ATTORNEY | HOURLY RATE | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015[31] | 2016 |
| Pamela J. Moore | $500/hr. | $500/hr. | - | $500/hr. | $520/hr. |
| Elizabeth M. Smith | $395/hr. | $395/hr. | $395/hr. | $395/hr. | - |
| Kelly B. Gallagher | $350/hr. | $350/hr. | - | $380/hr. | $390/hr. |
| Jordan Abbott | - | $275/hr. | - | - | - |
| Catherine M. Gray | - | - | $390/hr. | - | - |
| Joshua J. Wyatt | - | - | - | - | $350/hr. |
| Paralegal | - | $195/hr. | $200/hr. | $205/hr. | $210/hr. |

### b) Number of Hours Reasonably Expended

To determine the number of reasonable hours expended, contemporaneous time records,

affidavits, and other materials must support the prevailing party's fee application. *Chambless v.*

*Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058 (2d Cir. 1989); *N.Y. State Ass'n for*

*Retarded Children, Inc.*, 711 F.2d at 1147-48.  The number of hours should be reduced for

excessive, redundant, vague, or otherwise unnecessary hours. *Quarantino v. Tiffany & Co.*, 166

F.3d 422, 425 (2d Cir. 1999).  "In so doing, the district court does not play the role of an

uninformed arbiter but may look to its own familiarity with the case and its experience generally

as well as to the evidentiary submissions and arguments of the parties." *Bliven v. Hunt*, 579 F.3d

---

[29] Refers to the Affidavit of Pamela J. Moore in Support of Plaintiff's Motion for Assessment of Damages. (Docket No. 119).

[30] Refers to the Affidavit of Pamela J. Moore submitted in response to the Court's November 10, 2016 Order. (Docket No. 152).

[31] The Court notes that the requested hourly rates for Pamela J. Moore, Kelly B. Gallagher and paralegal assistance in the October 31, 2015 and November 30, 2015 invoices, (Moore Aff. at ¶¶ 6, 38, 39), differ from the hourly rates listed on the contemporaneous time records for the same billing periods, (Docket No. 156-4 at 25, 27).  Plaintiff provides no explanation for this discrepancy.  The Court will impute the requested lower rates as set forth in Affidavit of Pamela J. Moore. (Moore Aff. at ¶¶ 6, 38, 39).

204, 213 (2d Cir. 2009) (internal quotation marks and citation omitted).  "The critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Cesario v. BNI Constr., Inc.*, No. 07 Civ. 8545, 2008 WL 5210209, at *7 (S.D.N.Y. Dec. 15, 2008) (citing *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).

The Court has reviewed McCarter & English LLP's contemporaneous time records, along with the task descriptions set forth in the Affidavit of Pamela J. Moore and the Declaration of Kelly Burns Gallagher, and finds them to be reasonable.[32] (Moore Aff.; Gallagher Dec.[33]; Docket Nos. 156-1 to 156-5).  Counsel exercised prudent billing judgment in providing a twenty-percent courtesy discount on all invoices and granting a variety of other reductions. (Moore Aff. ¶¶ 10, 12, 44).  Accordingly, I respectfully recommend awarding punitive damages, in the form of attorneys' fees, as follows:

|  |  | 2012 | 2013 | 2014 | 2015 | 2016 | Total Amount |
|---|---|---|---|---|---|---|---|
| **Pamela Moore** | Hours: | 6.1 | 9.5 | 0 | 3.1 | 18.6 | |
| | Rate: | $500.00 | $500.00 | $0.00 | $500.00 | $520.00 | |
| | Total: | $3,050.00 | $4,750.00 | $0.00 | $1,550.00 | $9,672.00 | $19,022.00 |
| **Elizabeth M Smith** | Hours: | 2.5 | 234.9 | 112.4 | 49.3 | 0 | |
| | Rate: | $395.00 | $395.00 | $395.00 | $395.00 | $0.00 | |
| | Total: | $987.50 | $92,785.50 | $44,398.00 | $19,473.50 | $0.00 | $157,644.50 |
| **Kelly B. Gallagher** | Hours: | 16.9 | 228.1 | 0 | 11.2 | 15.1 | |
| | Rate: | $350.00 | $350.00 | $0.00 | $380.00 | $390.00 | |
| | Total: | $5,915.00 | $79,835.00 | $0.00 | $4,256.00 | $5,889.00 | $95,895.00 |

[32] The Court has also reviewed Plaintiff's reply, (Docket No. 151), to Defendants' letter of July 15, 2016 concerning the reasonableness of the hours Plaintiff expended in prosecuting its 2013 contempt motion, (Docket No. 143).  The Court finds the hours, the type of work performed, and the resulting fees associated with Plaintiff's 2013 contempt motion to be reasonable. *See, e.g.*, *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) (awarding reasonable costs incurred in prosecuting continued contempt); *Estiverne v. Esernio-Jenssen*, 908 F. Supp. 2d 305, 310 (E.D.N.Y. 2012) (awarding attorneys' fees in time spent in settlement negotiations).

[33] Refers to the Declaration of Kelly Burns Gallagher, (Docket No. 156), submitted in response to the Court's November 23, 2016 Order denying Plaintiff's Motion to Seal, (Docket No. 154).

| | | 2012 | 2013 | 2014 | 2015 | 2016 | Total Amount |
|---|---|---|---|---|---|---|---|
| **Jordan Abbott** | Hours: | 0 | 3 | 0 | 0 | 0 | |
| | Rate: | $0.00 | $275.00 | $0.00 | $0.00 | $0.00 | |
| | Total: | $0.00 | $825.00 | $0.00 | $0.00 | $0.00 | $825.00 |
| **Catherine M. Gray** | Hours: | 0 | 0 | 4.2 | 0 | 0 | |
| | Rate: | $0.00 | $0.00 | $390.00 | $0.00 | $0.00 | |
| | Total: | $0.00 | $0.00 | $1,638.00 | $0.00 | $0.00 | $1,638.00 |
| **Joshua J. Wyatt** | Hours: | 0 | 0 | 0 | 0 | 9.5 | |
| | Rate: | $0.00 | $0.00 | $0.00 | $0.00 | $350.00 | |
| | Total: | $0.00 | $0.00 | $0.00 | $0.00 | $3,325.00 | $3,325.00 |
| **Paralegal** | Hours: | 0 | 64.1 | 9.6 | 3.9 | 16.1 | |
| | Rate: | $0.00 | $195.00 | $200.00 | $205.00 | $210.00 | |
| | Total: | $0.00 | $12,499.50 | $1,920.00 | $799.50 | $3,381.00 | $18,600.00 |
| **GRAND TOTAL**[34] | | | | | | | $223,951.01 |

## J. Damages for Contempt[35]

Plaintiff seeks damages comprising any and all fees associated with filing its contempt motion. (Docket No. 116 at 18). Judge Karas held Defendants in contempt of the December 27, 2012 Preliminary Injunction and reserved, for a later date, a determination of the appropriate sanctions to impose. (Docket No. 32).

"[A] court may assess attorneys' fees as a sanction for the 'willful disobedience of a court order.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967); *see also New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 96 (2d Cir. 1998) ("A finding that a contemnor's misconduct was willful strongly supports granting attorneys' fees and costs to the party prosecuting the contempt."),

---

[34] Includes counsel's twenty percent courtesy discount and one-time fee reductions of $3,200, $450 and $9,958.59. (*See* Moore Aff. ¶¶ 10, 12, 44).

[35] Defendants argue that Judge Karas did not refer the issue of contempt damages to this Court for inclusion in the instant inquest. (Opposition at 4). However, Judge Karas' June 22, 2016 Order of Reference explicitly directs the undersigned to make a finding on this issue. (Docket No. 137). Thus, this Court will proceed accordingly.

*citing Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126 126, 130 (2d Cir. 1979).

To establish willful contempt, it must be shown that the "contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *New York State Nat'l Org. for Women v. Terry*, 952 F.Supp. 1033, 1043 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998); *see also Mingoia v. Crescent Wall Sys.*, 03 Civ. 7143(THK), 2005 WL 991773 at *5 n. 3 (S.D.N.Y. Apr. 26, 2005) (same), *citing Bear U.S.A. Inc. v. William Kim*, 71 F.Supp.2d 237, 249-250 (S.D.N.Y. 1999).

The record here contains clear and convincing evidence that Defendants had (1) actual notice of the temporary restraining order and repeatedly acknowledged its existence in his correspondence, (Docket Nos. 8, 11-12, 28); (2) never contested his ability to comply with it; (3) never sought to have the order modified; and (4) did not make a good faith effort to comply with it.

Damages for this conduct, however, have already been awarded in connection with the Court's finding that punitive damages in the form of attorneys' fees are appropriate. To further award contempt damages for the same attorneys' fees granted above would be redundant and excessive. Accordingly, I respectfully recommend that no damages for contempt be awarded.

## K.  Plaintiff's Request for a Permanent Injunction

Plaintiff renews its request for the imposition of a permanent injunction, arguing that Scherer should be permanently enjoined from (1) using Shamrock Power's trade secrets, and (2) competing against Shamrock Power in the geographic area that was his territory as a Shamrock Power employee. (Docket No. 116 at 15).  Judge Karas found that Plaintiff, in its Motion for Partial Summary Judgment, "failed to make the showing required to warrant imposition of a

permanent injunction," (Summary Judgment Order at 60), but provided Plaintiff the instant opportunity to submit additional evidence demonstrating irreparable harm.

A court may grant a permanent injunction if a plaintiff demonstrates the following three factors: (1) success on the merits; (2) the lack of an adequate remedy at law; and (3) irreparable harm if relief is not granted. *SunTrust Banks, Inc. v. Turnberry Capital Mgmt. LP*, 945 F.Supp.2d 415, 420 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 566 F. App'x 32 (2d Cir. 2014); *see also J.P. Morgan Sec. LLC v. Quinnipiac Univ.*, No. 14–CV–429, 2015 WL 2452406, at *3 (S.D.N.Y. May 22, 2015) (same). While Plaintiff clarifies its reliance on *Monovis v. Aquino*, 905 F.Supp. 1205 (1994), it does not offer any additional evidence or argument to demonstrate satisfaction of the pleading requirements for a permanent injunction. Plaintiff's failure to propound any new facts to support its contention that monetary damages are inadequate and that irreparable harm will result if relief is not granted undermines its demand for a permanent injunction. Therefore, I respectfully recommend that Plaintiff's request for a permanent injunction be denied.

## III. CONCLUSION

For the foregoing reasons, I respectfully recommend entry of a judgment awarding Plaintiff: (1) $99,824.93 for its breach of fiduciary duty claim, (2) $118,532.30 for its faithless servant claim, (3) $51,557.80 for its misappropriation of trade secrets claim, (4) $223,951.01 in punitive damages, and (5) prejudgment interest at 9% per annum from January 5, 2015 to the date judgment is entered. Additionally, I respectfully recommend that no fraud in the inducement/unjust enrichment or contempt damages be awarded. Finally, I respectfully recommend that Plaintiff's request for a permanent injunction and Motion to Strike be denied, and that Defendants' requests set forth in their July 13, 2016 letter be denied.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and

Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for

computing time).  Objections and responses to objections, if any, shall be filed with the Clerk of

the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the

United States District Court, Southern District of New York, 300 Quarropas Street, White Plains,

New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth

M. Karas and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that will be

rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga

Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).


Dated:    December 7, 2016
          White Plains, New York


                                    **RESPECTFULLY SUBMITTED,**


                                    _____
                                    JUDITH C. McCARTHY
                                    United States Magistrate Judge